The case is REMANDED for further proceedings consistent with this opinion.

**Raymond J. DONOVAN, Secretary of Labor, United States Department of Labor, Plaintiff-Appellant,**

v.

**Jerry BRANDEL, Individually, and d/b/a Jerry Brandel Farms, et al., Defendants-Appellees.**

No. 83–1228.

United States Court of Appeals, Sixth Circuit.

April 30, 1985.

Before KENNEDY and JONES, Circuit Judges, and CHURCHILL, District Judge.*

ORDER

The Court not having favored rehearing en banc in this case, the petition for rehearing is referred to our panel for disposition.

The petition for hearing states that the appeal involves the following issue:

Whether a panel of this Court erred in holding that migrant farm workers' children under 12 years of age were not employees of the farm owner when they

* Honorable James P. Churchill, United States District Court, Eastern District of Michigan, sitting

harvested his pickle crop, so that the children were denied the protection of the Fair Labor Standards Act's prohibition against oppressive child labor.

This issue involving the relationship between the appellee and children under 12 years of age if the parent is an independent contractor was never raised nor considered by the trial court nor by the panel, [736 F.2d 1114 (6 Cir.1984)], and it is in appropriate for consideration at this stage of the appeal.

Upon consideration, IT IS ORDERED that the petition for rehearing be and hereby is denied. The Court's decision is without prejudice to such new issue.

Judge Jones would grant rehearing on the issue of whether the pickle pickers are "employees" of Brandel Farms for the purposes of the FLSA.

**Patrick W. SIMMONS, Petitioner,**

v.

**INTERSTATE COMMERCE COMMISSION and United States of America, Respondents.**

**Illinois Central Gulf Railroad, Intervening Respondent.**

Nos. 83–1474, 83–2820.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 21, 1985.

Decided March 15, 1985.

As Amended May 2, 1985.

Rehearing and Rehearing En Banc Denied May 2, 1985.

by designation.

Gordon P. McDougall, Washington, D.C., for petitioner.

J. Carol Brooks, I.C.C., Washington, D.C., for respondents.

John H. Doeringer, ICG Railroad, Chicago, Ill., for intervening respondent.

Before BAUER and POSNER, Circuit Judges, and JAMESON, Senior District Judge.[*]

POSNER, Circuit Judge.

These petitions to review two related orders of the Interstate Commerce Commission require us to consider a question of first impression under the provision of the Interstate Commerce Act governing offers of financial assistance to head off the abandonment of a railroad line, 49 U.S.C. § 10905. The question is whether the Commission is authorized or required to impose labor-protective conditions on either or both of the parties to a section 10905 sale. Patrick Simmons, the Illinois legislative director of a union representing employees of the selling railroad, has asked us on the Union's behalf to set aside a Commission order that approved such a sale without such conditions, the Commission's ground being that they were not required or even authorized. *Illinois Central Gulf R.R. — Abandonment — in Alexander County, Il,* 366 I.C.C. 911 (1983). A subordinate dispute over a trackage-rights agreement entered into by the parties to the sale and approved by the Commission in a separate order is discussed at the end of this opinion.

Section 10905 dates from the Railroad Revitalization and Regulatory Reform Act of 1976 (see 90 Stat. 129) but was significantly amended by the Staggers Rail Act of 1980, and in its present form provides as follows. Within 10 days after the Commission announces its decision to allow a railroad to abandon a line, anyone (including another railroad, as the Commission held in this case, 366 I.C.C. at 914 n. 3, and the petitioner does not dispute) may offer to buy the line. 49 U.S.C. § 10905(c). If within 15 days after the announcement the Commission finds that the offeror is financially responsible and that the offer satisfies certain minimum conditions, it must suspend its permission to abandon in order to give the parties time to negotiate the purchase. § 10905(d). If as in this case the parties come to terms, "the Commission shall approve the transaction and dismiss the application for abandonment," provided the terms include an agreement to continue providing rail service on the line. § 10905(e). But if the parties are unable to come to terms, and either of them requests the Commission to fix the terms for them, the Commission shall do so, based on the fair market value of the line. §§ 10905(e)–(f). The provision for forced sale was added in 1980. Before then all the Commission could do was delay abandonment for six months to give a prospective purchaser a chance to negotiate with the railroad before the line was abandoned. See *Chicago & N.W. Transport Co. v. United States,* 678 F.2d 665, 667–68 (7th Cir.1982).

In 1982 the Illinois Central Gulf Railroad applied to the Commission for permission to abandon an 18-mile line in rural Illinois. A local railroad owned and operated by three men, the Cairo Terminal Railroad Company, filed an application under section 10905 to acquire all but one half mile of the line. The two railroads arrived at mutually satisfactory terms for the sale, and the Commission approved it. The Commission also approved the abandonment of the remaining half mile, subject to *Oregon Short Line* protective conditions, which the Com-

[*] Hon. William J. Jameson of the District of Montana, sitting by designation.

mission routinely imposes in abandonment cases and which among other things require the abandoning railroad to pay, for six years, the wages of employees as a result of the abandonment. See *Oregon Short Line R. Co.—Abandonment—Goshen*, 360 I.C.C. 91, 93–95, 98–103 (1979). The Commission refused to impose any conditions on the sale of the 17.5 mile stretch to the Cairo Terminal Railroad Company, rejecting Simmons' argument for *New York Dock* conditions. These are the same as *Oregon Short Line* conditions, but are imposed on both parties to railroad mergers and consolidations governed by 49 U.S.C. § 11343. See *New York Dock Ry.—Control—Brooklyn Eastern Dist. Terminal*, 360 I.C.C. 60, 84–90, aff'd under the name of *New York Dock Ry. v. United States*, 609 F.2d 83 (2d Cir.1979). The *Oregon Short Line* conditions were designed for abandonments, and in most abandonment cases there is only one party, the abandoning railroad.

■ Since *Oregon Short Line* conditions are identical to *New York Dock Ry.* conditions so far as length of job protection is concerned, it might seem to make no difference whether or not the Commission was required or allowed to impose the latter conditions, or any conditions, on the sale of the 17.5 mile stretch to the Cairo Terminal Railroad Company. But it might make a difference. The arbitrator (see below) might decide that not all of the workers affected by the sale of the 17.5 mile stretch were also affected by the abandonment of the remaining half mile, in which event some workers would lose out who would have been protected if conditions had been imposed on the entire transaction. And some workers might fare better if the Cairo Terminal Railroad Company shared the labor-protective obligations of the Illinois Central Gulf Railroad, as it would if *New York Dock* conditions were imposed. Labor protection doesn't just mean guaranteeing dismissed workers six years of full pay. In fact that is just a residual benefit to which they are entitled if they are terminated. They must first be given a chance to get permanent jobs elsewhere on the railroad, and they have a right to arbitrate any dispute with the railroad over the latter's failure to find them permanent jobs. See *Southern Pac. Transport. Co. v. ICC*, 736 F.2d 708, 714 (D.C.Cir.1984) (per curiam); *Walsh v. United States*, 723 F.2d 570, 573–74 (7th Cir.1983). Maybe some of the affected workers in this case could force the Cairo Terminal Railroad Company to take them on if that railroad as well as Illinois Central has an obligation to consider their claims to permanent jobs—though, given the minute size of the Cairo Terminal Railroad Company, this seems pretty unlikely.

■ Since the question whether the Commission was required or allowed to impose labor-protective conditions—specifically the *New York Dock* conditions—is not moot, let us turn to it, noting first the Supreme Court's recent and emphatic directive to give great weight to an administrative agency's interpretation of the statutes it enforces. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, —— U.S. ——, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984). The Commission's interpretation of section 10905 is reasonable, and we think correct. The statute says nothing about labor-protective conditions and, what is more important, contains no suggestion that the Commission has discretion to impose conditions of any sort on transactions within the statute's scope, unless the parties fail to come to terms and the Commission has to fix the terms if requested to do so by either party. But the terms that it fixes in such cases are "the price and other terms of sale," § 10905(f)(1)(C)—not conditions protecting labor. And if the offer to purchase the about-to-be-abandoned line is accepted and provides for a continuation of rail service, the Commission "shall approve the transaction," period. § 10905(e). This is quite different from what the Commission is required to do when it approves the abandonment of a line, which is to issue a certificate that shall "contain provisions to protect the interests of employees." 49 U.S.C. § 10903(b)(2). And section 10901 empow-

ers (but does not require) the Commission to impress labor protection on acquisitions of individual lines, while section 11347 makes such protection mandatory for rail mergers and consolidations. The statute that the Supreme Court construed in *ICC v. Railway Labor Executives Ass'n*, 315 U.S. 373, 62 S.Ct. 717, 86 L.Ed. 904 (1942), to allow the Commission to impose labor-protective conditions empowered the Commission to impose "such terms and conditions as in its judgment the public convenience and necessity may require." *Id.* at 375, 62 S.Ct. at 719. There is no similar provision here. Against this background, the silence of section 10905 on the matter of conditions has a certain eloquence, especially when we consider the active participation of the railroad unions in revisions of the Interstate Commerce Act.

■ Nor is a transaction under section 10905 a transaction under another section as well—either 10901 (acquisition of a line) or 11343 (rail merger or consolidation). The Commission once thought it was, see *Abandonment of Railroad Lines & Discontinuance of Service*, 354 I.C.C. 252, 270 (1976), but changed its mind, and rightly so, after the Staggers Act amended section 10905. See *Abandonment of Railroad Lines & Discontinuance of Service*, 365 I.C.C. 249, 259–60 (1981); 49 C.F.R. § 1152.27(j)(2). For as the section now reads, a transaction under it cannot be an abandonment, because when the Commission approves a section 10905 sale it must dismiss the abandonment proceeding. And it cannot be a line acquisition or a railroad consolidation, as section 10905 requires the Commission to act peremptorily if the conditions in the section are satisfied, regardless of whether the criteria used in evaluating other transactions are satisfied. See 49 U.S.C. §§ 10901(a), 11344(d).

■ Against this it can be argued that a transaction (a section 10905 purchase) that is in effect a composite of two transactions which if done separately would require protective conditions ought to require the conditions too, lest railroads be encouraged to do in one step what if done in two (aban-

donment followed by purchase) would clearly require the conditions. It is not much of an answer that the Commission may not be *required* to impose protective conditions on the two-step transaction because protective conditions are discretionary in line-acquisition cases under section 10901. This section traditionally has not been thought applicable where a line is being acquired by another railroad for continued rail service. See our recent discussion in *In re Chicago, M., St. P. & P. R.R.*, 756 F.2d 508, 514–15 (7th Cir.1985). There is some authority for applying it where the acquired line is very tiny and for not insisting on labor-protective conditions in such a case even if the line would be abandoned if not acquired, but in the principal case the seller was selling his entire (tiny) railroad business, which is not what happened here. See *Okmulgee N. Ry. Abandonment*, 320 I.C.C. 637 (1964); *In re Valuation Proceedings, etc.*, 531 F.Supp. 1191, 1265–66 (Spec.R.R.R. Act Ct.1981) (per curiam). In any event, though it is more than likely that the Commission would not have imposed protective conditions in this case if it had thought it had the power but not the duty to do so, we cannot uphold the Commission's order on that ground; we cannot exercise discretion committed to it. See, e.g., *SEC v. Chenery Corp.*, 318 U.S. 80, 94, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943); *General Elec. Co. v. NRC*, 750 F.2d 1394, 1403–04 (7th Cir.1984); *Illinois v. ICC*, 722 F.2d 1341, 1348 (7th Cir.1983). It believed it had no power, and its decision must stand or fall on that belief.

It might seem that if, as Simmons emphatically asserts, labor-protective conditions must be imposed on both parties to a section 10905 transaction, the purposes of the statute will be defeated; potential offerors such as the Cairo Terminal Railway Company will be deterred by the prospect of bearing the heavy costs of those conditions. But this is not a very telling point either, though mentioned with approval by the Commission. The selling railroad can always reduce the sale price, or promise the buying railroad to bear the entire cost

of the conditions. Since the seller would have to bear that cost anyway if it simply abandoned the line, the price reduction or the guarantee is not an added detriment imposed by section 10905 on the seller and therefore will not deter section 10905 transactions.

A better answer to the loophole argument is that employees often (though not always, and maybe not here, given the buyer's small size) are better off if a line is acquired than if it is abandoned, since if it is abandoned the employment of railroad employees will surely be reduced. So there is no great anomaly if the appearance of a white knight (the Cairo Terminal Railroad Company) who saves a line from abandonment has the consequence of disentitling employees on the line to protective conditions and forcing them to take their chances on being kept on by the line's new owner. Cf. *Railway Labor Executives' Ass'n v. ICC*, 735 F.2d 691, 704 (2d Cir. 1984) (Friendly, J.).

The argument for reading into section 10905 a power or duty to impose protective conditions on transactions would have been stronger before section 10905 was amended in 1980 to empower the Commission to fix the terms of sale. If negotiations fall through and either party requests the Commission to fix those terms, the selling railroad is not allowed to reject the Commission's terms, even if it would rather abandon the line after it finds out what the Commission's terms are—even, indeed, if it always considered abandonment preferable to sale. It is true that the Commission did not fix the terms here, that the parties came to terms. But of course they bargained knowing that if Illinois Central held out for more than the Cairo Terminal Railroad Company considered fair market value, Cairo Terminal could ask the Commission to fix the terms of sale and Illinois Central would be bound. The important thing is that the statute provides for a forced sale. To allow the Commission to pile onerous labor-protective conditions on the selling railroad may exceed Congress's willingness to apply compulsion to railroads abandoning unprofitable lines. Not only might the Commission, being eager for the sale to go through, set too low a price for the line; it might (under Simmons' view) further reduce the net benefits of the sale to the railroad by imposing costly labor-protective conditions.

Finally, if we held that section 10905 authorizes labor protection we would have the embarrassing task of deciding without statutory guidance what protection it should be: *Oregon Short Line*? *New York Dock*? Discretionary protection as under section 10901? Good arguments could be made for all three and we are disinclined to choose among them without a clearer indication that Congress wanted us to do so. If the statute is to be supplemented, it should be done by Congress or by the Commission, not by us. Having due regard for the Commission's considered refusal to do so, we hold that there is no labor protection in a section 10905 sale.

■ The second issue in the case arises from the Illinois Central's having agreed to give the Cairo Terminal Railroad Company trackage rights over a 4.5 mile stretch of Illinois Central track between the 17.5 mile stretch that Illinois Central was selling to Cairo Terminal and the latter's operations in Cairo. Although such a transaction ordinarily would require the same type of determination that the Commission makes when asked to approve a railroad merger or consolidation, see 49 U.S.C. §§ 11343(a)(6), 11344(a), the Commission exempted the transaction pursuant to section 10505(a), which empowers the Commission to exempt from regulation a "transaction or service ... of limited scope" as to which regulation "is not necessary to carry out" the policies enumerated in 49 U.S.C. § 10101a (a list of 15 goals of federal railroad policy). Simmons mainly objects to the Commission's having broken off the 4.5 mile trackage-rights agreement from the larger transaction between Illinois Central and Cairo Terminal, a transaction having two parts—the sale of the 17.5 mile stretch, and the trackage rights to connect up that stretch with the rest of Cairo Terminal's

system. Simmons argues that if the two parts together would not have been exempted if viewed as a single transaction, the Commission ought not to be allowed to break them apart and exempt one component.

■ The general point has obvious merit. Every transaction can be decomposed. If the Commission had treated the acquisition of the 17.5 mile stretch as 17.5 acquisitions of 1-mile stretches, and had exempted each one on the basis of limited scope, it would have been acting arbitrarily. But the sale of the 17.5 mile stretch was a separate transaction from the trackage-rights agreement by virtue of section 10905, and one the Commission had no discretion to turn down once the parties came to terms. Although the Commission could have consolidated the trackage-rights agreement and the line transfer procedurally, it could not have merged them substantively, because the statutory criteria of approval are different.

■ Regarding the merits of exempting the trackage-rights agreement, viewed separately from the section 10905 sale as it must be, we cannot fault the Commission either. "Limited scope" aptly describes a tiny stretch of line to be used by a tiny railroad for light traffic in a rural area; and we cannot see how the exemption here could interfere with any policies in the Interstate Commerce Act. The legislative history of section 10505 (exemption), well summarized in *Illinois Commerce Comm'n v. ICC*, 749 F.2d 875, 883–85 (D.C. Cir.1984), indicates that Congress wanted the exemption power to be wielded boldly; the exercise in this case was exceedingly modest.

■ Simmons also raises a procedural issue. After the Commission granted the exemption, Simmons filed a petition to reopen the proceeding. See 49 U.S.C. § 10327(g)(1)(A); 49 C.F.R. § 1115.4. The Commission described the petition as one to revoke an exemption, and from this Simmons argues that the Commission placed too heavy a burden of persuasion on him.

This argument is hard to follow. Anyone who files a petition to reopen a decision has the burden of persuading the tribunal that reopening is warranted; and nothing in section 10505(d), which governs the revocation of exemptions, suggests a higher burden of persuasion. It therefore makes no difference which provision (revocation or reopening) the Commission thought it was proceeding under. As a matter of fact the Commission applied the specific criteria governing reopening. It thus inquired whether Simmons had demonstrated any material error or changed circumstances, and found quite correctly that he had not and that therefore there was no basis for reopening the proceeding.

Finally, Simmons' challenge to the Commission's grant of a construction exemption to the Cairo Terminal Railroad Company for work in integrating the newly acquired line into its existing business is frivolous, and ought not have been made. We remind the petitioner that frivolous arguments merely detract, and distract, from substantial ones.

AFFIRMED.