766 F.2d 1177
 120 L.R.R.M. (BNA) 2314
 Patrick W. SIMMONS, Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Illinois Central Gulf Railroad Company and Cisco Cooperative
Grain Company, Intervening Respondents.
 No. 84-1352.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 27, 1985.
Decided July 15, 1985.
 
 Gordon P. MacDougall, Washington, D.C., for petitioner.
 Sidney L. Strickland, Jr., I.C.C., Washington, D.C., for respondents.
 Richard M. Kamoski, Chicago, Ill., for Ill. Cent. Gulf R. Co.
 Before ESCHBACH and FLAUM, Circuit Judges, and DOYLE, Senior District Judge.*
 ESCHBACH, Circuit Judge.
 
 
 1
 The primary question presented by this petition for review of an order of the Interstate Commerce Commission ("Commission" or "ICC") is whether the Commission is authorized to impose labor-protective conditions in a "forced" or "involuntary" sale under 49 U.S.C. Sec. 10905 ("Sec. 10905"). For the reasons stated below, we agree with the Commission's conclusion that it was without authority to impose such conditions in an "involuntary" Sec. 10905 sale; the petition for review will be denied.
 
 
 2
 * The facts of this dispute may be summarized as follows:
 
 
 3
 In January 1982, the Illinois Central Gulf Railroad Company ("Illinois Central") filed a notice of intent to abandon approximately 13 1/2 miles of railway line between Cisco and Green's Switch, Illinois. See 49 U.S.C. Sec. 10903. A complete application for abandonment was filed by Illinois Central in February 1982. In May 1982, the ICC issued its decision granting Illinois Central's abandonment application.
 
 
 4
 Under Sec. 10905, however, after the ICC approves an abandonment of a line, any "financially responsible person" who will provide continued rail service over the line may file within 10 days of the ICC's approval an offer to purchase the line. Cisco Cooperative Grain Company ("Cisco") did in fact file such an offer within the time period and was found by the Commission to be "financially responsible." The ICC then postponed the issuance of the certificate of abandonment to allow Illinois Central and Cisco either to negotiate a price or to request that the Commission set the terms of the sale. See Sec. 10905(d). The parties were unable to come to an agreement; Cisco then petitioned the Commission to establish the terms. The ICC did in fact determine the values of the properties involved, but on appeal that decision was remanded by this court for reconsideration. Illinois Central Gulf Railroad Co. v. Interstate Commerce Commission, 717 F.2d 408 (7th Cir.1983).
 
 
 5
 When this action was again before the Commission on remand, petitioner Simmons--the Illinois Legislative Director for the United Transportation Union, which is the collective-bargaining representative for the majority of persons employed by Illinois Central in freight-train service--filed a petition on November 21, 1983, to intervene for the purpose of seeking the imposition by the ICC of labor-protective conditions in the proposed Sec. 10905 purchase. In an order dated February 13, 1984, the Commission denied the petition to intervene and cited its decision in Illinois Central Gulf Railroad Co.--Abandonment, 366 I.C.C. 911 (1983), aff'd sub nom. Simmons v. Interstate Commerce Commission, 760 F.2d 126 (7th Cir.1985) ("Simmons I" ), in which the agency ruled that it was without authority to impose labor-protective conditions in a Sec. 10905 transaction. The Commission then redetermined the value of the properties and Cisco ultimately accepted these terms. Accordingly, the ICC in an order dated March 12, 1984, approved the transfer of the line to Cisco and dismissed the abandonment application. See Sec. 10905(e). No labor-protective conditions were imposed. Simmons now seeks review of the Commission's denial of his petition to intervene.
 
 II
 A. Denial of Petition to Intervene
 
 6
 Simmons first argues that the Commission improperly denied his petition to intervene. We initially note that Simmons sought to intervene solely for the purpose of seeking the imposition of labor-protective conditions in the impending Sec. 10905 transaction. As we read its order, the Commission reached the merits of the intervention petition and concluded that the agency was without authority to impose such conditions. Because the ICC found itself unable as a matter of law to provide petitioner with the relief he sought, any further proceedings on the question of labor-protective conditions would have been an exercise in futility; accordingly, the petition to intervene was denied. We add, however, that Simmons's petition was denied on this narrow ground alone. Thus, we do not understand the Commission's denial to extend any further than the question of the imposition of labor-protective conditions.[1]
 
 
 7
 In considering the propriety of the Commission's denial of the petition for intervention, we must first determine whether the agency was correct in its conclusion that it was without authority to impose labor-protective conditions in a Sec. 10905 transaction.[2] If the agency was correct, then no further administrative proceedings are necessary.
 
 
 8
 B. Commission's Authority to Impose Labor-Protective Conditions
 
 
 9
 In denying the petition, the Commission relied on its decision in Simmons I for the conclusion that it was without authority under Sec. 10905 to impose labor-protective conditions. As indicated above, that decision was recently upheld by this court. Thus, it is clear that, in the case of a "voluntary" sale under Sec. 10905, the ICC is unable to impose such conditions.[3] The issue then in the instant case is whether the reasoning of Simmons I applies to a "forced" or "involuntary" sale under the statute. For the reasons stated below, we agree with the Commission that it does.[4]
 
 
 10
 The history and procedures of Sec. 10905 have been discussed elsewhere,[5] and will not be reiterated here. For the purposes of the instant dispute, however, it should be noted that in the original version of Sec. 10905, see 49 U.S.C. Sec. 1a(6) (1976), the Commission was not empowered to set the terms of compensation in the event that the parties were unable to come to an agreement. The Staggers Rail Act of 1980, P.L. No. 96-448, Sec. 402(c), 94 Stat. 1895, 1942-45 ("Staggers Act"), made two fundamental changes in Sec. 10905. First, in response to "hold out" and other problems created by the original statute, see Hayfield Northern Railroad Co. v. Chicago & Northwestern Transportation Co., --- U.S. ----, 104 S.Ct. 2610, 2615-16, 81 L.Ed.2d 527 (1984), Congress authorized the ICC on request from either party to determine "the price and other terms of sale," Sec. 10905(f)(1)(C), if the parties initially fail to agree on these terms. In no case, however, is the Commission to set a price that is below the fair market value of the line. The terms established by the ICC are binding on the "seller," although the "buyer" may withdraw its offer to purchase within 10 days of the Commission's decision. Second, Sec. 10905(e) now provides that, if the buyer and seller enter into an agreement, the Commission "shall approve the transaction and dismiss the application of abandonment or discontinuance."[6]
 
 
 11
 The first argument of the Commission, which was upheld in Simmons I, is that the mandatory requirements under Sec. 10905(e) of both approval of the transaction and dismissal of the abandonment certificate demonstrate that the labor-protective conditions attached to the agency's approval of the abandonment, see, e.g., Sec. 10903(b)(2), do not come into play when a Sec. 10905 transaction is completed. See also 49 C.F.R. Sec. 1152.27(f)(2), (h)(6) (1984); cf. Abandonment of Railroad Lines & Discontinuance of Service, 365 I.C.C. 249, 259-61, 272 (1981). However, these requirements--without more--do not determine whether labor-protective conditions may be imposed under Sec. 10905. Nonetheless, they do show that any authority the Commission may have to condition a transaction under other provisions does not "carry through" in a Sec. 10905 transaction. As a result, Sec. 10905 is an independent and discrete procedure, and any authority to impose such conditions must be derived from that provision alone.
 
 
 12
 After Simmons I, it is clear that, in the context of a "voluntary" sale, the Commission cannot impose labor-protective conditions. Thus, the question presented by the instant petition for review is whether the Commission's ability to set the "price and other terms of sale" under Sec. 10905(f)(1)(C) allows it to impose labor-protective conditions in an "involuntary" sale. Certainly the language of Sec. 10905 does not expressly state that the Commission has this authority. As we found in Simmons I, 760 F.2d at 129, a common-sense reading of Sec. 10905(f)(1)(C) does not suggest that it refers to labor-protective conditions. Furthermore, as the Commission forcefully asserted in its second argument of Simmons I, see 366 I.C.C. at 913-14, other provisions of the Staggers Act stand in stark contrast to Sec. 10905(f)(1)(C), because they specifically refer to the protection of employees.[7] The language of these contemporaneous amendments indicates that Congress simply does not use the phrase "price and other terms of sale" to refer to labor-protective conditions. Petitioner has not referred this court to any contrary indications in the legislative history. Indeed, the committee reports discussing Sec. 10905 are silent on the subject of labor protection. See H.Conf.Rep. No. 1430, 96th Cong., 2d Sess. 125 (1980), U.S.Code Cong. & Admin.News 1980, pp. 3978, 4110; S.Rep. No. 470, 96th Cong., 1st Sess. 40 (1979).
 
 
 13
 In his reply brief, Simmons acknowledges that labor-protective conditions are not "terms of sale," but rather that they are "imposed by the I.C.C. as a condition to the agency's approval of a transaction." Thus, petitioner in fact acknowledges that these conditions would not ordinarily be imposed when the Commission sets the terms of the transaction under Sec. 10905(f)(1)(C), but only when it subsequently approves the sale and dismisses the initial abandonment certificate. Consideration of the provisions of the Staggers Act that specifically refer to the protection of employees, see supra note 7, confirms that such protection is indeed imposed by the Commission as a condition of the final agency approval and not as a condition of the underlying sale. Section 10905, however, allows the Commission to determine only the conditions of the underlying sale. Thus, petitioner has in fact conceded that Sec. 10905 does not expressly authorize the Commission to impose labor-protective conditions.
 
 
 14
 Therefore, in the context of "involuntary," as well as "voluntary," sales, Sec. 10905 is silent on the Commission's authority to impose labor-protective conditions. This lacuna implicates all the concerns we identified in Simmons I, 760 F.2d at 129-31, with regard to a judicial construction of Sec. 10905 that would allow for the imposition of such conditions. When the silence of Sec. 10905 is considered in the light of the extensive consideration given to labor protection in the Staggers Act and the provisions of that Act that refer specifically to employee protection, we cannot say that the Commission's interpretation is unreasonable. As we stated in Simmons I, 760 F.2d at 131, "[i]f the statute is to be supplemented, it should be done by Congress or by the Commission, not by us." Cf. Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., --- U.S. ----, 104 S.Ct. 2778, 2792-93, 81 L.Ed.2d 694 (1984).
 
 
 15
 In view of this disposition, we need not consider the Commission's argument, see 366 I.C.C. at 913, that Congress "acquiesced" in the agency's post-1980 interpretation of Sec. 10905. However, we will briefly consider a type of congressional "acquiescence" argument advanced by petitioner. As we noted in Simmons I, 760 F.2d at 130, the Commission, prior to the Staggers Act, had interpreted Sec. 10905 to allow for the imposition of labor-protective conditions. Petitioner argues that Congress in essence "ratified" these administrative interpretations in 1980 with the passage of the Staggers Act. We disagree.
 
 
 16
 We initially note that reliance on the chimerical concepts of congressional "silence" or "inaction" as a basis for "acquiescence" or "ratification" is dubious at best. Nonetheless, we do not have to delve into these conundrums, as it is clear that Congress did not simply reenact Sec. 10905 in 1980. To the contrary, the Staggers Act calls for the mandatory dismissal of the abandonment certificate and approval of the transaction when the parties agree to a Sec. 10905 sale. In addition, the Act allowed the Commission in the case of an "involuntary" sale under Sec. 10905 to set only the "price and other terms of sale," while it expressly amended other provisions to provide for labor protection. Thus, no "ratification" of previous administrative interpretations can be inferred from congressional "silence" when the statutory scheme has been so fundamentally altered.
 
 III
 
 17
 Because the Commission correctly concluded that it had no authority to impose labor-protective conditions in an "involuntary" sale under Sec. 10905, further administrative proceedings would be of no value. The petition for review is DENIED.
 
 
 
 *
 The Honorable James E. Doyle, Senior District Judge for the Western District of Wisconsin, sitting by designation
 
 
 [1]
 At oral argument, counsel for petitioner maintained that the circumstances of this dispute had changed because Cisco was not operating the line. However, any questions arising from this alleged failure to provide continued rail service were not considered by the Commission in its order denying petitioner leave to intervene; thus, the issue is not properly presented to this court. As we noted above, the Commission's denial of intervention was limited solely to the question whether the agency had the authority to impose labor-protective conditions in a Sec. 10905 purchase. This ruling does not in any way prejudice the rights that petitioner may have in the event that Cisco does not operate the line
 
 
 [2]
 The parties have devoted considerable attention to questions relating to our standard of review. However, as we noted in Simmons I, 760 F.2d at 129, recent pronouncements from the Supreme Court indicate that, without regard to questions of administrative expertise, the judiciary should, as a matter of course, accord great weight to statutory interpretations rendered by the agency responsible for the statute's enforcement if Congress has not directly addressed the precise question at issue and if the agency's interpretation is not unreasonable. See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., --- U.S. ----, 104 S.Ct. 2778, 2781-83, 81 L.Ed.2d 694 (1984). The reasoning of Chevron is controlling in this case, because Sec. 10905 is indeed silent on the question of labor-protective conditions
 
 
 [3]
 In this opinion, the term "voluntary sale" refers to a transaction in which the parties agree on the price and other terms of sale without the aid of the Commission. The terms "forced sale" and "involuntary sale" refer to a transaction in which the Commission, pursuant to Sec. 10905(f)(1)(C), determines the price and other terms of sale
 
 
 [4]
 Petitioner argues that the instant dispute may be distinguished from Simmons I because Cisco is not a "carrier." We disagree. Section 10905 does not require that the purchaser be a "carrier," but only a "financially responsible person" who will provide continued rail service over the line. See Sec. 10905(d), (e); see also 1 U.S.C. Sec. 1; 49 U.S.C. Sec. 10102(17). Thus, Cisco's status as a "non-carrier" is not a relevant consideration
 
 
 [5]
 See, e.g., Hayfield Northern Railroad Co. v. Chicago & Northwestern Transportation Co., --- U.S. ----, 104 S.Ct. 2610, 2615-16, 81 L.Ed.2d 527 (1984); Simmons I, 760 F.2d at 128-29; Chicago & Northwestern Transportation Co. v. United States, 678 F.2d 665, 666-68 (7th Cir.1982)
 
 
 [6]
 A superficial reading of Sec. 10905(e) may suggest that the ICC is only required to dismiss the abandonment certificate in the case of a "voluntary" sale. However, the language of Sec. 10905(e) makes no distinction between "voluntary" and "involuntary" sales, and consideration of Sec. 10905 in toto supports the Commission's interpretation that it must dismiss the certificate without regard to the character of the underlying sale. Compare, e.g., Sec. 10905(e) with Sec. 10905(f)(2); cf. 49 U.S.C. Sec. 10905(b) (Supp. II 1978). We do not understand petitioner to argue to the contrary
 
 
 [7]
 See Staggers Act Secs. 213 (codified at 49 U.S.C. Sec. 10505(g)), 219(g) (codified at 49 U.S.C. Sec. 10706 note), 221 (codified at 49 U.S.C. Sec. 10901(e)), 223 (codified at U.S.C. Sec. 11103(c)(1), (2)), 227 (codified at 11 U.S.C. Secs. 1170(e), 1172(c)), 401(a) (codified at 49 U.S.C. Sec. 10910(j)); cf. Interstate Commerce Commission v. Railway Labor Executives Ass'n, 315 U.S. 373, 62 S.Ct. 717, 86 L.Ed. 904 (1942) (provision empowering Commission to impose "such terms and conditions as in its judgment the public convenience and necessity may require" in abandonment proceedings allowed for imposition of labor-protective conditions); United States v. Lowden, 308 U.S. 225, 60 S.Ct. 248, 84 L.Ed. 208 (1939) (statute providing that "[i]f ... the Commission finds that, subject to such terms and conditions and such modifications as it shall find to be just and reasonable, the proposed consolidation ... will promote the public interest, it may enter an order approving and authorizing such consolidation ... upon the terms and conditions and with the modifications so found to be just and reasonable" allowed for imposition of labor-protective conditions in consolidation proceedings)
 Congressional enactments subsequent to the Staggers Act, see e.g., Rail Safety and Service Improvement Act of 1982, P.L. No. 97-468, tit. II, Sec. 213, 96 Stat. 2543, 2545 (codified at 45 U.S.C. Sec. 915(b)(3)(E)), also indicate that the phrase "price and other terms of sale" does not refer to labor-protective conditions.