RIPPLE, Circuit Judge.
 

 In this appeal, the Railway Labor Executives’ Association (RLEA) challenges Order Nos. 832
 
 [1]
 
 and 866
 
 [2]
 
 entered by the district
 
 *113
 
 court in the ongoing bankruptcy proceeding of the Chicago, Milwaukee, St. Paul & Pacific Railroad Company (debtor or Milwaukee Road). Order No. 832 confirmed the final plan of reorganization submitted by the trustee of the debtor. Order No. 866 set a consummation date for the discharge of the debtor and the trustee and for the dissolution of the estate. In essence, RLEA claims that Order No. 832 should be set aside because the plan of reorganization approved in that order failed to provide for claims of RLEA members made pursuant to a wage deferral agreement entered into by RLEA and the debtor. RLEA further argues that, because the order affirming the plan was improper, the order setting a date for the consummation of the plan was improper. We find these claims to have no merit. Accordingly, we affirm the orders of the district court.
 

 I
 

 A detailed factual rendition of this long, complicated proceeding would unduly burden the length of this opinion. Therefore, we shall limit the following presentation to those events necessary to the issues before us in this appeal.
 

 A.
 
 Background
 

 On December 19, 1977, the Milwaukee Road filed a petition for reorganization pursuant to section 77 of the Bankruptcy Act, 11 U.S.C. § 205.
 
 [3]
 
 Although the railroad was suffering substantial financial losses at the time, the reorganization court initially ordered it to continue its operations. In November 1979, with permission of the court, the trustee suspended operations over more than half of the Milwaukee Road system. However, during the same month, Congress enacted the Milwaukee Railroad Restructuring Act (MRRA or Restructuring Act) which provided that the entire railroad should be operated until the Interstate Commerce Commission (ICC) determined whether the Milwaukee Road could be reorganized.
 
 See
 
 45 U.S.C. §§ 901-922.
 

 After the ICC determined, in early 1980, that the existing plan of reorganization was not feasible, the trustee obtained orders allowing the abandonment of approximately two-thirds of the Milwaukee Road’s system.
 

 B.
 
 The Wage Deferral Agreement
 

 In August 1980, the trustee entered into an agreement with most of RLEA’s member organizations (these organizations represented Milwaukee Road employees) whereby 10% of those employees’ wages were deferred between August 1, 1980 and January 1, 1981, and 7% of their wages were deferred for the year 1981. Appellant’s App.F at 1. The agreement, the pertinent text of which is set forth in the footnote,
 
 [4]
 
 provided that, if the railroad
 
 *114
 
 were reorganized, the employees would receive preferred or preference stock in the reorganized successor to the Milwaukee Road. The agreement further provided that each employee would receive an amount of stock equal to 1.3 times the amount of wages deferred for the years 1980 and 1981, as well as 1.2 times the amount deferred in 1982, and 1.1 times the amount deferred in 1983 (should the agreement be extended to those years).
 
 Id.
 
 at 3, ¶ 6(a). Finally, the agreement also provided that, if the railroad were not reorganized, but instead its rail assets were liquidated, the employees would have claims in the amount of their deferred compensation and that those claims would have the same status as costs of administration.
 
 Id.
 
 at 3-4, 116(b). The reorganization court approved the wage deferral agreement in Order No. 397.
 
 Matter of Chicago, Milwaukee, St. Paul & Pac. R.R.,
 
 No. 77 B 8999 (N.D.Ill. Sept. 8, 1980); Appellant’s App.G.
 

 C.
 
 The Trustee’s Plan of Reorganization and the Various Offers to Purchase the “Core Assets”
 

 The trustee and other third parties interested in purchasing the Debtor’s “core assets”
 
 [5]
 
 then submitted plans of reorganization to the reorganization court.
 

 1. The GTC’s Plan
 

 In March 1983, the trustee filed an amended plan of reorganization. This new plan contemplated reorganizing the core assets of the Milwaukee Road separately from its other assets. In the March 1983 plan, the trustee proposed that, once this reorganization took place, the Grand Trunk Corporation (GTC) would acquire the stock of the Milwaukee Road. This plan proposed to satisfy the wage deferral claims through the issuance of preferred stock.
 

 2. The CNW and Soo Plans
 

 Shortly after the GTC plan was filed with the ICC, two other railroads, the Chicago & Northwestern Transportation Company (CNW) and the Soo Line Railroad Company (Soo), filed applications to purchase the Milwaukee Road’s operating rail assets. Both the CNW plan and the Soo plan differed from the GTC plan. Rather than providing for the acquisition of the stock of the reorganized Milwaukee Road by the purchaser, these plans proposed, through asset purchase agreements (APAs), that the purchaser would create a subsidiary that would purchase the core assets of the Milwaukee Road. As originally submitted, these plans proposed to satisfy the wage deferral claims through the issuance of preferred stock, just as the GTC plan had. Later, however, both the CNW and the Soo submitted amended plans in which they proposed to satisfy the wage deferral claims with cash payments if possible (with payment being at face value of the wage deferral claims). If cash repayments were not possible, these amended plans provided that the claims would be satisfied through the issuance of preferred stock.
 
 [6]
 

 
 *115
 
 D.
 
 Initial ICC Scrutiny of the Reorganization Plans
 

 The reorganization court transmitted the various reorganization plans to the ICC as required by the MRRA. In its first order, the ICC approved the Soo’s plan, including the proposal to satisfy the Wage Deferral Agreement claims in cash rather than preferred stock. The ICC therefore certified the Soo plan to the reorganization court. At this time, the ICC took no action on the CNW’s plan and rejected the GTC’s plan.
 

 After the ICC approved the plan of reorganization submitted by the Soo, the CNW raised its bid by approximately $210 million. The trustee then sought permission to seek ICC approval of the revised CNW plan. The reorganization court granted this request. It returned both the Soo and the CNW plan to the ICC and asked that the ICC state a preference for either the Soo or the CNW plan.
 

 E.
 
 The Application of the Trustee to the Reorganization Court to Settle the Wage Deferral Claims
 

 On November 28, 1984 — while the Soo and CNW plans were still pending before the ICC — the trustee sought the permission of the reorganization court to settle the wage deferral claims in accordance with the terms contained in the APAs of both the Soo and the CNW. The trustee told the court that this action was taken to permit the employees to enjoy favorable tax treatment if the funds were received in 1984. He argued that the proposals before the ICC (one of which would presumably be effectuated) constituted a liquidation, not a reorganization, of the Milwaukee Road’s assets. Therefore, he maintained cash payments, rather than stock, were appropriate. However, because the sale of the core assets was not yet final, the trustee suggested that the employees be offered the choice of a present cash payment or deferring decision until the sale of the assets and a determination of their entitlement to preferred stock.
 

 On December 10, 1984, the reorganization court entered Order No. 789 which authorized the trustee to offer the employees cash payments in the actual amount of the deferred wages in full satisfaction of his obligation under the Wage Deferral Agreement.
 
 Matter of Chicago, Milwaukee, St. Paul & Pac. R.R.,
 
 No. 77 B 8999 (N.D.Ill. Dec. 10, 1984); Appellees’ App.A, Ex. A. The vast majority of the employees accepted this offer by the end of the calendar year.
 
 [7]
 

 F.The Second ICC Decision
 

 On January 11, 1985, the ICC delivered its second decision. The agency reaffirmed its approval of the Soo proposal. It also conditionally approved the CNW proposal,
 
 [8]
 
 and, by a 4-3 vote, expressed, in reply to
 
 *116
 
 the request of the reorganization court, a preference for the Soo plan.
 

 G.
 
 Sale of the Core Assets by the Reorganization Court
 

 In February 1985, the reorganization court considered the sale of the Milwaukee Road’s core assets to either the Soo or the CNW. The court focused only on the APAs, rather than considering them as part of any comprehensive reorganization plan. On February 19, 1985, in Order No. 809, the reorganization court approved the Soo’s proposed purchase of the core assets of the Milwaukee Road.
 
 Matter of Chicago, Milwaukee, St. Paul & Pac. R.R.,
 
 No. 77 B 8999 (N.D.Ill. Feb. 19, 1985); Appellant’s App.B [hereinafter cited as Order No. 809]. The sale closed the next day after several creditors had unsuccessfully sought to stay the order in both the reorganization court and in this court.
 

 Under the terms of the Soo’s APA, the Soo assumed all of the Milwaukee Road’s obligations under the Wage Deferral Agreement. As noted earlier, the Soo intended to repay the wage deferral claims in cash in the amount of wages actually deferred. If cash payments were not possible, the Soo proposed repayment through preferred stock.
 

 H.
 
 The ICC Terminates Continuing Jurisdiction
 

 On March 8, 1985, the trustee filed a petition requesting that the ICC state whether its approval of the final plan of reorganization was subject to the agency’s approval. On April 2, 1985, the ICC ruled that it “no longer retains jurisdiction over the reorganization of the Debtor, or any administrative aspects of the reorganization.”
 
 Chicago, Milwaukee, St. Paul & Pac. R.R.,
 
 Finance Docket No. 28640, slip op. at 2 (I.C.C. Apr. 2, 1985) (LEXIS, Trans library, ICC file). Noted the ICC:
 

 It is unnecessary for us to review the final Plan to be filed with the Court. Moreover, since the Debtor is no longer operating as a common carrier railroad, its reorganization under the Final plan would be a non-railroad reorganization, comparable to the reorganization of the Chicago, Rock Island and Pacific Railroad Company. Since the Debtor is no longer a railroad and its reorganization is a non-railroad reorganization, we no longer have jurisdiction over the reorganization or its administrative aspects.
 

 Id.
 
 at 1.
 

 I.Appeal of Order 809 and Review of the ICC Decision in this Court
 

 RLEA appealed from Order No. 809 and from the ruling of the ICC. The appeals were consolidated. On August 20, 1986, this court issued its decision that effectively rejected both challenges.
 
 Matter of Chicago, Milwaukee, St. Paul & Pac. R.R.,
 
 799 F.2d 317 (7th Cir.1986),
 
 cert. denied,
 
 — U.S. —, 107 S.Ct. 2460, 95 L.Ed.2d 869 (1987) [hereinafter cited as
 
 Order No. 809 Appeal
 
 ].
 

 With respect to the sale of the core assets to the Soo, the court held that the challenge was mooted by former Bankruptcy Rule 8-703(a)(6):
 
 [9]
 

 “Unless an order approving a sale of property ... is stayed pending appeal, the sale to a good faith purchaser ... shall not be affected by the reversal or modification of such order on appeal, whether or not the purchaser ... knows of the pendency of the appeal.”
 

 Id.
 
 at 329 (quoting former Bankruptcy Rule 8-703(a)(6)). The court also determined that the ICC correctly declined to exercise continuing jurisdiction over the Milwaukee Road’s final plan of reorganization. This court held that, while the MRRA required the reorganization court to
 
 *117
 
 obtain the ICC’s advice before sale of the assets, it permitted the court to make its own decision on the final sale:
 

 The Restructuring Act changed the rules, however, by allowing the district court to make its own decision in the end. Here the district court took the ICC’s advice and sold the lines to the Soo. The district court had the authority to turn the Milwaukee into a real estate company on its own.
 

 Id.
 
 at 331. Continued the court:
 

 There is no doubt that by April 1985 the Milwaukee was not operating a railroad. Section 77(d) refers to “the debt- or”, and this might be the basis of a contention that the Milwaukee remained subject to § 77(d) even though it was no longer a railroad, needing the ICC’s permission to get out of bankruptcy. The ICC reads the statute otherwise, however, and its interpretation is entitled to respect.
 
 Chemical Manufacturers Ass’n v. Natural Resources Defense Council, Inc.,
 
 470 U.S. 116, 105 S.Ct. 1102, 1108, 84 L.Ed.2d 90 (1985);
 
 Watkins v. Blinzinger,
 
 789 F.2d 474, 478 (7th Cir.1986).
 

 Id.
 
 at 331-32.
 

 Finally, the court added the following caveat to its decision:
 

 The district court confirmed the Milwaukee’s plan of reorganization on July 12, 1985. The RLEA and several other parties have filed appeals from the order confirming the plan. Although many of the RLEA’s arguments about the order of sale and the ICC's refusal to review the plan go to the merits of that plan, the RLEA’s appeal from the confirmation is not before us. It and all other appeals have been consolidated for separate disposition. We have disposed of RLEA’s arguments on jurisdictional grounds. Nothing we say here bears on the merits of any appeal from the order confirming the plan, and we mean to leave no clues about what our views might be.
 

 Id.
 
 at 332.
 

 J.
 
 Soo’s Payment of Wage Deferral Claims
 

 In compliance with Order No. 809, the Soo reimbursed the trustee for settlements he had previously made to the employees.
 
 See supra
 
 subsection E. It also contacted the remaining 125 employees and tendered payment. All but 12 employees accepted. Therefore, at this point only 12 employees, with claims totaling $27,460.37, remain.
 

 K.
 
 Confirmation and Consummation of the Final Plan of Reorganization
 

 On May 1, 1985, the trustee filed a final plan with the reorganization court. This plan did not provide for the payment of claims under the Wage Deferral Agreement. RLEA objected to the plan on the ground that it did not address the wage deferral claims question. In approving and confirming the plan, the reorganization court rejected the RLEA’s position and, in Order No. 832, wrote:
 

 With respect to the objection of RLEA seeking provision in the Plan for employees’ claims under the Wage Deferral Agreement approved in this Court’s Order No. 551 [sic], the Court finds that Order No. 809 relieved the Trustee from all obligations and liabilities with respect to those claims, which accordingly are not entitled to provision in the Plan.
 

 Order No. 832 at 7, 1113.
 

 Finally, in October 1985, the trustee petitioned the court “to set a Consummation Date for the ... reorganization [of the Milwaukee Road] and to enter a final decree which both discharged the Trustee and closed the reorganization proceedings.” Appellant’s Br. at 20. RLEA objected to the entry of such an order, mainly on the ground that, until this court had resolved the challenges to Order No. 809,
 
 see supra
 
 subsection G, and the plan of reorganization, it would be premature to enter such an order. On November 12, 1985, the reorganization court entered Order No. 866 setting November 25, 1985 as the consummation date on which “all right, title and interest of the Trustee in the property of the Estate shall vest in and become the absolute property of the Reorganized Company.” Order No. 866 at 7,116. Order No. 866 also discharged the trustee and debtor
 
 *118
 
 and terminated jurisdiction over the debtor and the reorganization proceedings, except as specifically retained.
 

 On appeal, RLEA alleges that the reorganization plan approved by the reorganization court does not meet the requirements of § 77(b) and 77(e) of the Bankruptcy Act because it fails to address the claims of RLEA’s members under the wage deferral agreement. RLEA also argues that, because Order No. 832 should be set aside, the entry of Order No. 866 was premature, and therefore should also be set aside.
 

 II
 

 Analysis
 

 A.
 
 Order No. 832
 

 1. Role of ICC
 

 RLEA’s first contention is that the district court did not have jurisdiction to approve the final plan proposed by the trustee because that plan varied from the plan approved by the ICC in that it failed to provide for the payment of the wage deferral claims. The RLEA admits that it “unsuccessfully argued in its appeal from Order 809 that Section 77 gave the ICC and not the reorganization court, the responsibility to devise the Plan of Reorganization.” Appellant’s Br. at 22. Nevertheless, it argues that this court's decision in the
 
 Order No. 809 Appeal
 
 “should not be read as authorizing the reorganization court to disregard, as occurred here, essential elements of the plan actually approved by the ICC.
 
 Ecker v. Western Pacific R.R.,
 
 [318 U.S. 448, 63 S.Ct. 985, 87 L.Ed. 1166 (1943) ] and
 
 Palmer v. Massachusetts,
 
 308 U.S. 79, 87, 60 S.Ct. 34, 38, 84 L.Ed. 93 (1939).”
 
 Id.
 

 This argument must be rejected. In the
 
 Order No. 809 Appeal,
 
 this court specifically noted that, after the sale of the core assets to the Soo, this reorganization was, as the ICC itself had urged, no longer subject to the authority of the ICC. It simply was no longer a rail reorganization. As this court said in the
 
 Order No. 809 Appeal:
 

 The ICC has said its piece on this reorganization. Section 77(d) of the Bankruptcy Act was designed to ensure that the ICC could control railroad reorganizations. The ICC dominated this one, prevailing on every issue except the
 
 New York Dock
 
 conditions. It had nothing more to say, and an interpretation that would apply § 77(d) to firms that are not railroads any longer, despite the ICC’s protestation that it does not want to review anything, would not have any plausible function.
 

 799 F.2d at 332. Thus, we need not consider whether the plan approved by the reorganization court differed from that approved earlier by the ICC because, by the time the final plan was approved, the ICC no longer retained jurisdiction over the proceeding. Pursuant to the Restructuring Act, the Milwaukee Road had sold its railroad assets as this court has held that it was entitled to do.
 

 2. “Fair and Equitable”
 

 RLEA next contends that the plan as approved by the reorganization court was not fair and equitable as required by section 77(e). In making this argument, RLEA claims that the plan as approved by the district court violates the absolute priority rule,
 
 [10]
 
 because it fails to give recognition to the RLEA’s claims with respect to
 
 *119
 
 the Wage Deferral Agreement. The trustee’s plan is deficient, RLEA argues, because it assumes that the assignment to the Soo of the obligations under the Wage Deferral Agreement had also “discharged him from further liabilities for those obligations.” Appellant’s Br. at 24. Rather, argues RLEA, the “ ‘act of delegation ... does not relieve the delegant of the ultimate responsibility to see that the obligation is performed. If the delegate fails to perform, the delegant remains liable.’ ”
 
 Id.
 
 at 25 (quoting
 
 Contemporary Mission Inc. v. Famous Music Corp.,
 
 557 F.2d 918, 924 (2d Cir.1977)). “In keeping with the general and Illinois rule that obligations may be delegated, but not totally discharged,” continues the RLEA, “the discharge portion of Order 809 should be read as being effective
 
 only
 
 when effectuated by the Plan of Reorganization.”
 
 Id.
 
 at 26 (emphasis in original). Moreover, continues RLEA, Order No. 809 states that discharge is to be in accordance with the APA that was “an integral part of the Soo’s Amended Alternative Plan of Reorganization ... approved by the ICG.”
 
 Id.
 
 Thus, argues RLEA, the APA “contemplated that the discharge specified in Order 809 was to be effectuated, not by the sale order, but rather, by the Plan of Reorganization.”
 
 Id.
 

 Even if Order No. 809 is construed as having discharged the trustee and estate from further liability with respect to wage deferral claims, the matter should still be covered, argues RLEA, in the final plan of reorganization.
 

 What is important ... is that the obligations to the employees at issue in this case arose out of the reorganization process and were a part of these proceedings. As such, their satisfaction has to be a subject of the Plan of Reorganization if the absolute priority rule is to have any meaning.
 

 Id.
 
 at 27.
 

 We cannot accept RLEA’s argument that the failure of the final plan to deal with the Wage Deferral Agreement violates the absolute priority rule. Our starting point must be the fundamental reality that, in Order No. 809, the railroad assets of the Milwaukee Road were sold, in their entirety, to the Soo. In the sale of the operating assets of the railroad, the obligations of the debtor and the trustee under the Wage Deferral Agreement passed to the Soo. This sale of the debtor’s railroad assets to the Soo was, as this court pointed out in
 
 Order No. 809 Appeal,
 
 pursuant to explicit congressional authority.
 
 [11]
 
 Therefore, at the time the final plan was presented to the reorganization court, the claims of RLEA’s members were no longer the claims of creditors of the debtor or the trustee. As this court noted in
 
 Matter of Chicago, Milwaukee, St. Paul & Pac. R.R.,
 
 789 F.2d 1281 (7th Cir.1986)
 
 (Escanaba II):
 

 Liabilities arising out of the rail operations of the Milwaukee before this mitosis belong to the Soo.
 

 [[Image here]]
 

 The Milwaukee is no longer responsible for liabilities arising out of its former rail operations, except for liabilities expressly preserved by the asset purchase agreement and orders of the district court.
 

 Id.
 
 at 1282.
 

 Even if we were to accept the argument of the RLEA that the absolute priority rule is applicable and that the trustee retained some sort of residual responsibility to account for the wage deferment liability at
 
 *120
 
 the time of the formulation of the final plan, we would find no basis for granting relief to RLEA. The reorganization court had already provided a fair and equitable mechanism whereby the employees could obtain payment for their deferred wages. In Order No. 809, the reorganization court ordered the Soo to assume repayment obligations under the Wage Deferral Agreement, a plan that certainly provided the employees with an opportunity to recoup their deferred wages.
 
 [12]
 
 Certainly, no further payment was required. At the time of the entry of Order No. 809, it was clear that there was to be a liquidation, not a reorganization, of the core assets of the Milwaukee Road and the possibility of the employees having a right to preferred stock with a multiple had vanished.
 
 [13]
 

 B.
 
 Order No. 866
 

 Finally, RLEA argues that Order No. 866, setting a consummation date, should b'e vacated if order No. 832 is reversed, as Order No. 866 was entered prematurely. However, because we find no reason to reverse Order No. 832, and because we find no other reason why Order No. 866 might have been entered improperly, we also affirm Order No. 866.
 

 Conclusion
 

 Accordingly, we affirm Order No. 832 and Order No. 866 of the reorganization court.
 

 Affirmed.
 

 [1]
 

 .
 
 Matter of Chicago, Milwaukee, St. Paul & Pac. R.R.,
 
 No. 77 B 8999 (N.D.Ill. July 12, 1985); R.10 (Appeal #60) [hereinafter cited as Order No. 832].
 

 [2]
 

 .
 
 Matter of Chicago, Milwaukee, St. Paul & Pac. R.R.,
 
 No. 77 B 8999 (N.D.Ill. Nov. 12, 1985); R.9
 
 *113
 
 (Appeal #64) [hereinafter cited as Order No. 866].
 

 [3]
 

 . Although the Bankruptcy Act was repealed in 1979, and replaced by the Bankruptcy Reform Act of 1978, section 77 of the Bankruptcy Act applies to this case.
 
 In re Chicago, Milwaukee, St. Paul & Pac. R.R.,
 
 701 F.2d 604, 605 n. 1 (7th Cir.),
 
 cert. dismissed,
 
 463 U.S. 1233, 103 S.Ct. 3574, 77 L.Ed.2d 1416 (1983).
 

 [4]
 

 . Paragraph 6 of the Wage Deferral Agreement provides:
 

 (a). Upon the reorganization of the railroad, employees will receive preferred or preference stock in any reorganized successor to the Chicago, Milwaukee, St. Paul and Pacific Railroad Company which operates all or most of the lines currently being operated in an amount equal to 1.3 times the amount of wages deferred for 1980 and 1981. If the agreement is extended to 1982 or 1983, employees would receive stock in amount equal to 1.2 times the amount deferred in 1982 and 1.1 times the amount deferred in 1983. If required, the Trustee agrees that he will, at the expense of the estate, prior to the issuance of any stock, prepare and file with the Securities and Exchange Commission a Registration Statement under the Securities Act of 1933 relating to the distribution of such shares hereunder, will use his best efforts to have such Registration Statement become effective as promptly as possible, and, as soon as practicable on or after the effective date of such Registration Statement, will furnish each employee of the Company with a copy of any prospectus forming a part thereof. At the time of distribution, if the law permits, the preferred or preference stock may be paid into an Employee Stock Ownership Trust.
 

 
 *114
 
 (b). In the event a reorganized railroad as described in paragraph (a) of this section is not created and a liquidation of the Milwaukee’s rail operations is ordered, all employees receiving employee protection payments from the Milwaukee pursuant to the Agreement negotiated in accordance with Section 9 of the MRRA (except payments pursuant to sections 2, 3 or 4 of such Agreement) or pursuant to any other provision of law or contract shall have claims for the amount of their deferred compensation which are subordinated to the claims of the Milwaukee’s preferred stockholders. All employees not receiving such protection shall have claims for the amount of their deferred compensation with cost of administration status.
 

 Appellant’s App.F at 3-4, 1f 6.
 

 [5]
 

 . The “core assets” consisted of approximately one-third of the Milwaukee Road’s trackage, a line based mainly in the Midwest.
 

 [6]
 

 . The relevant provisions of the Asset Purchase Agreement (APA) provide:
 

 12. As of the Closing, SLRCO [a subsidiary of the Soo] or Soo agree to assume, discharge and pay in accordance with their respective terms and will become responsible for each of the liabilities and obligations of the Trustee as of the Closing Date relating to the Railroad (excluding those of the Motor Company) set forth in subparagraphs (a) through (m) below ("Rail Liabilities”).
 

 ******
 

 (k) Obligations with respect to the Wage Deferral Agreement executed pursuant to the
 
 *115
 
 Reorganization Court Order No. 397 among the Trustee and certain Labor Organizations.
 

 ******
 

 25. From and after the Trustee’s execution of this Agreement, the Trustee, SLRCO, and Soo will use their best efforts (including the prosecution of appeals where reasonable) to obtain all consents and approvals required under this Agreement together with the order of the Reorganization Court which will permit the transfer of Rail Assets free and clear of claims of third parties arising out of, or by reason of, that transfer. The Trustee shall further use his best efforts to obtain the order of the Reorganization Court providing for full satisfaction of the employee deferred compensation claims assumed by SLRCO and Soo in Paragraphs 12(j) and 12(k), by payment of their face amount (approximately $20,500,000 in cash), in the event Soo elects to use such method of payment. The Trustee further agrees to use his best efforts to facilitate the assumption by Soo and SLRCO of the obligations described in Paragraph 12(h) in accordance with the repayment terms currently in effect for the Trustee, without acceleration of the debts by any “due on sale” or similar clauses, and to take no action which would in any way interfere with or frustrate Soo and SLRCO’s ability to contest any actions of the United States Department of Transportation or Federal Financing Bank with respect to collection of those obligations.
 

 Appellant’s Supp.App. at 6, 10-12.
 

 [7]
 

 . The trustee’s offer was accepted by 8352 employees. Only 125 employees did not accept the offer. Therefore, of the approximately $20.6 million in deferred wages available under the Wage Deferral Agreement, only $285,282.59 remained to be disbursed.
 

 [8]
 

 . The ICC conditioned its approval of the CNW plan on the requirement,
 
 inter alia,
 
 that the CNW provide at least
 
 "New York dock"
 
 conditions for the employees affected by the plan.
 
 *116
 
 The specifics of the "New York dock requirements” are not important for purposes of this appeal. A “compact description,”
 
 Matter of Chicago, Milwaukee, St. Paul & Pac. R.R.,
 
 799 F.2d 317, 328 (7th Cir.1986),
 
 cert. denied,
 
 — U.S. —, 107 S.Ct. 2460, 95 L.Ed.2d 869 (1987) [hereinafter cited as
 
 Order No. 809 Appeal
 
 ], of those requirements is provided in
 
 Simmons v. ICC,
 
 760 F.2d 126, 128-29 (7th Cir.1985),
 
 cert. denied,
 
 474 U.S. 1055, 106 S.Ct. 791, 88 L.Ed.2d 769 (1986).
 

 [9]
 

 . As noted by the court in
 
 Order No. 809 Appeal,
 
 "[t]he Bankruptcy Code of 1978 codifies this rule [8—703(a)(6) ] in 11 U.S.C. § 363(m).” 799 F.2d at 329.
 

 [10]
 

 . The operation of this rule is summarized in Collier on Bankruptcy:
 

 Absolute priority principle.
 
 — It is now settled that a plan under § 77 must pass the same test of fairness that is applied to plans in equity receiverships under the rule set forth in
 
 Northern Pacific Railway Co. v. Boyd,
 
 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931 (1913), and
 
 Kansas City Terminal Railway Co.
 
 v.
 
 Central Union Trust Co.,
 
 271 U.S. 445, 46 S.Ct. 549, 70 L.Ed. 1028 (1926). Those cases held that the plan must assure to creditors their priority over shareholders, under the penalty of the plan being called a fraudulent conveyance and voidable. Also see
 
 First National Bank v. Flershem,
 
 290 U.S. 504, 54 S.Ct. 298, 78 L.Ed. 465 (1934). This so-called "absolute priority principle” is applicable to reorganizations of both solvent and insolvent corporations in order to determine whether the plans proposed are "fair and equitable”, and means that the senior claimants are entitled to "full compensatory treatment” for the rights they surrender in the reorganization before anything may be allocated to junior interests. If a plan provides for distribution to junior in
 
 *119
 
 terests and shareholders at the expense of the senior creditors, the plan is not "fair and equitable.”
 

 5 J. Moore & L. King, Collier on Bankruptcy ¶ 77.14, at 562-63 n. 15 (14th ed. 1978).
 

 [11]
 

 . We cannot, therefore, accept RLEA’s argument that the trustee retained some residual responsibility for the payment of the wage deferral obligations after the sale of the railroad assets. The transaction approved in Order No. 809 was hardly an ordinary common law assignment such as the assignment at issue in
 
 Contemporary Mission, Inc. v. Famous Music Corp.,
 
 557 F.2d 918 (2d Cir.1977). Here, the responsibility for deferred wage claims was assigned to the Soo by specific judicial order and pursuant to specific statutory authority as part of the overall reorganization of the debtor. Indeed, Order No. 809 read in part "the Trustee and the Milwaukee shall be relieved from any and all liabilities in connection with or arising out of such obligations_”
 
 Id.
 
 at 11, ¶ 6. RLEA was aware of the proposed assignment and had an opportunity to object.
 

 [12]
 

 . Appellee suggests that Order No. 789,
 
 see supra
 
 part I, also demonstrates that the reorganization court had approved cash as the correct method of settlement. Appellant’s Br. at 38. However, we believe that this order is more properly characterized as an offer of settlement, not a definitive ruling that cash payment was the correct method of payment under the Wage Deferral Agreement.
 

 [13]
 

 . RLEA’s absolute priority claim rests upon the argument that the sale to the Soo was a reorganization rather than a liquidation — if the sale was a liquidation, RLEA’s members have already been offered the amounts to which they are entitled. To dispose of RLEA’s claim, this court must characterize that sale as either a reorganization or a liquidation. We find the latter.
 

 Relying on 11 U.S.C. § 1167 (which prohibits the trustee or the reorganization court from altering wages or working conditions established by a collective bargaining agreement subject to the Railway Labor Act (RLA)) and
 
 Order of Railroad Conductors v. Pitney,
 
 326 U.S. 561, 66 S.Ct. 322, 90 L.Ed. 318 (1946) (which holds that the National Railroad Adjustment Board rather than a reorganization court should resolve disputes concerning the interpretation of a collective bargaining agreement in the context of a railroad reorganization), RLEA argues that, because the interpretation of the Wage Deferral Agreement is at issue, the question must be submitted to the Adjustment Board. We disagree. The authority relied upon by RLEA is inapplicable in the present situation. The agreement was executed, after having received the necessary approval of the reorganization court, as part of the reorganization proceedings. Moreover, the issue raised here — whether the trustee has violated the absolute priority rule by characterizing the sale as a liquidation rather than a reorganization and therefore failing to follow properly the reorganization court’s order — is an issue grounded firmly in bankruptcy rather than labor law. When such a question of bankruptcy law arises in the course of a reorganization proceeding, the body "especially competent and specifically designated to deal with it,”
 
 Pitney,
 
 326 U.S. at 567, 66 S.Ct. at 325, is the reorganization court, not the agencies created under the RLA. Any other interpretation would frustrate the congressional interest exhibited in the Bankruptcy Act, the Milwaukee Railroad Restructuring Act and the Railway Labor Act. As
 
 Pitney
 
 teaches, our task is to further, not frustrate, the congressional purpose.