791 F.2d 994
 122 L.R.R.M. (BNA) 2850, 104 Lab.Cas. P 11,946
 RAILWAY LABOR EXECUTIVES' ASSOCIATION, Petitioner,
v.
UNITED STATES of America, and Interstate Commerce
Commission, Respondents,
The Staten Island Railroad Corporation, the Staten Island
Railway Corporation, Intervenors.
 Nos. 413, 414. Docket 85-4093, 85-4107.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 9, 1985.
Decided May 22, 1986.
 
 John O'B. Clarke, Jr., Washington, D.C. (William J. Birney and Kimberly A. Madigan, Highsaw & Mahoney, P.C., Washington, D.C., of counsel), for petitioner.
 H. Glenn Scammel, Washington, D.C. (Robert S. Burk, Gen. Counsel, Douglas H. Ginsburg, Asst. Atty. Gen., John J. McCarthy, Jr., Deputy Associate Gen. Counsel, John J. Powers, III, Frederic Freilicher, of counsel), for respondents ICC and United States of America.
 John J. Gallagher, Washington, D.C. (Ronald M. Johnson, Akin, Gump, Strauss, Hauer & Feld, Peter J. Shudtz, Washington, D.C., of counsel), for intervenor Staten Island Ry. Corp.
 William F. Sheehan, Washington, D.C. (Shea & Gardner, Washington, D.C., of counsel), for intervenor Staten Island Railroad Corp.
 Before VAN GRAAFEILAND, NEWMAN and MINER, Circuit Judges.
 MINER, Circuit Judge:
 
 
 1
 These are two consolidated petitions to review two Interstate Commerce Commission ("ICC") orders approving the sale under 49 U.S.C. Sec. 10905 of 16.68 miles of railroad track by the Staten Island Railroad Corporation ("SIRC") to the Staten Island Railway Corporation ("SIRY"), a newly formed, wholly owned subsidiary of the New York, Susquehanna & Western Railway Corporation ("NYS & W"), and exempting from the provisos of 49 U.S.C. Sec. 10901 the collateral assignment by SIRC to SIRY of trackage rights over 14.48 miles of track, owned by the Staten Island Rapid Transit Authority ("SIRTOA").[1] The Railway Labor Executives' Association ("RLEA"), whose member unions represent for collective bargaining purposes thirty-one SIRC employees affected by the transactions, filed these petitions to challenge the ICC's determination not to impose any labor protective conditions upon the parties.
 
 
 2
 The petitions raise the issues whether SIRC's initial application to abandon its rail service was a subterfuge to permit it to sell its lines to a carrier through the financial assistance provisions of 49 U.S.C. Sec. 10905; whether the ICC is empowered to impose labor protective conditions on the parties to a section 10905 sale; whether the line acquisition provisions of 49 U.S.C. Sec. 10901, governing acquisitions by noncarriers, encompass the assignment of trackage rights by a rail carrier to a noncarrier; and, if such transactions are included within section 10901, whether a newly formed, wholly owned subsidiary of a rail carrier may be considered to be a noncarrier for the purpose of a trackage rights acquisition under section 10901. We hold that RLEA's failure to raise its subterfuge argument before the ICC precludes us from reviewing the issue here. We further conclude that the ICC's interpretation of section 10905, which prohibits the imposition of labor protective conditions in sales under that provision, and of section 10901, which embraces trackage rights acquisitions of the type at issue here, are reasonable. Accordingly, we affirm the ICC's orders and deny and dismiss the petitions.
 
 I. BACKGROUND
 
 3
 A. SIRC's Application to Abandon and the Sale of Rail Line Under 49 U.S.C. Sec. 10905
 
 
 4
 Prior to the approval of the transactions at issue, SIRC's rail system consisted of 31.16 miles of track and trackage rights running across Staten Island and into northern New Jersey. The system provided essential rail transportation services to industrial and business concerns throughout Staten Island and was considered by local officials to be "important to the local economy as well as to the overall economic health of the City of New York." Joint Appendix at 61. In December of 1984, SIRC gave public notice of its intention to abandon its entire rail system, claiming loss of profits and poor conditions of the lines as the bases for its decision.[2] Pursuant to 49 U.S.C. Sec. 10903, which allows a rail carrier to abandon a portion of its rail system "only if the [ICC] finds that the present or future public convenience and necessity require or permit the abandonment or discontinuance," SIRC filed an application to abandon with the ICC. The application indicated that SIRC had commenced negotiations with the Delaware Otsego System ("DO"), the noncarrier owner of NYS & W, over the possible sale of the lines to DO. SIRC further requested that the ICC impose no labor protective conditions on the abandonment on the ground that SIRC was attempting to abandon its entire line and therefore would no longer be in the business of providing rail service.[3]
 
 
 5
 In accordance with the requirements of 49 U.S.C. Sec. 10904(a)(3), SIRC published its notice of intent and forwarded copies of the notice to all significant users of the line for public comment. In its formal comments to the ICC on the application, RLEA requested that the ICC impose labor protective conditions on the parties, as required by 49 U.S.C. Sec. 10903(b)(2). On February 1, 1985, the ICC issued a decision approving the abandonment application and the issuance to SIRC of a certificate of public convenience and necessity. In light of RLEA's comments and the requirements of section 10903(b)(2),[4] however, the ICC imposed on SIRC the labor protective conditions set forth in Oregon Short Line Co.--Abandonment--Goshen, 360 I.C.C. 91 (1979).[5]
 
 
 6
 Once approval of the abandonment was obtained, SIRC began to actively pursue a sale of its entire line under section 10905, entitled "Offers of financial assistance to avoid abandonment and discontinuance." Section 10905 is a "forced sale" provision which attempts to preserve rail service over lines that otherwise would be abandoned. Under section 10905, within ten days of the publication of the ICC's decision on the abandonment, "any person may offer to pay the carrier a subsidy or offer to purchase the line." Id. Sec. 10905(c). The effective date of the abandonment certificate simultaneously is stayed pending a determination of the legitimacy of any offers. Id. Sec. 10904(c)(4). If within fifteen days after the publication an offeror is determined to be financially responsible and the offer to be statutorily satisfactory, the ICC is required to "postpone the issuance of a certificate" in order to give the parties an opportunity to negotiate a final sale. Id. Sec. 10905(e). If, the parties are able to reach an agreement for the sale which ensures continued rail service on the line, "the Commission shall approve the transaction and dismiss the application for abandonment or discontinuance." Id. Sec. 10905(e). If, however, the parties are unable to reach an agreement, either party may request that the ICC fix a price for the sale, based upon the fair market value of the line. Id. Sec. 10905(f)(1). The ICC's decision then becomes binding on the parties unless the offeror withdraws its offer to purchase the line within ten days of the ICC's decision. Id. Sec. 10905(f)(2).
 
 
 7
 Here, within ten days of the ICC's approval of SIRC's application to abandon, NYS & W made an offer to purchase SIRC's entire line and informed the ICC of its intention. NYS & W's offer indicated that, prior to consummation of the sale, it might substitute a new corporate affiliate, wholly owned by NYS & W, as the purchasing entity. This affiliate, SIRY, was to be formed specifically for this transaction and thus had not participated in rail carriage operations previously. The offer also indicated that DO would "guarantee the financial responsibility of [SIRY]."[6] Joint Appendix at 70.
 
 
 8
 On February 20, 1985, the ICC issued a decision finding NYS & W's offer to be bona fide and NYS & W to be financially responsible under section 10905(d). Accordingly, the ICC postponed the issuance of SIRC's abandonment certificate to give SIRC and NYS & W an opportunity to negotiate. The ICC, however, also found that only the sale of the 16.68 miles of track owned by SIRC itself could be processed through the sale provisions of section 10905, and it disapproved the inclusion under that provision of the acquisition of trackage rights over 14.48 miles of track owned by SIRTOA. Noting that "[t]he purpose of section 10905 is to allow for the continuation of rail service," The Staten Island Railroad Corporation--Abandonment and Discontinuance of Service--In Richmond County, NY and Union County, NJ, A.B.-231 (Feb. 20, 1985), the ICC determined that "[by] its very nature, a line over which a party has trackage rights is a line that will remain in service whether the trackage rights are transferred or not." Id.
 
 
 9
 Within days of the ICC's decision, SIRC requested that the ICC withdraw that portion of SIRC's abandonment application which dealt with trackage rights, leaving only the sale of the tracks owned by SIRC as the topic of the section 10905 sale. On March 1, 1985, the ICC approved this request. Two weeks later, SIRC, NYS & W and SIRY informed the ICC that they had reached an agreement for the sale under section 10905 of the 16.68 miles of track and requested final approval of the sale. The parties further requested that the ICC impose no labor protective conditions. RLEA opposed approval of the section 10905 sale without the imposition of such conditions. It asserted that the ICC should read section 10903(b)(2), which mandates imposition of labor protective measures for all partial line abandonments, in conjunction with section 10905 so as to impose such conditions for all sales under that provision.
 
 
 10
 On April 19, 1985, following the directives of section 10905(e), which requires the ICC to approve a sale and dismiss the application for abandonment of the line once an agreement between the purchasing and selling parties has been reached, the ICC authorized the sale to SIRY. In so doing, it tacitly declined to impose labor protective conditions on the sale, apparently adhering to its prior view that the lack of any specific reference to such conditions within the text of section 10905 foreclosed the ICC from imposing them in such a sale. E.g., Illinois Central Gulf Railroad--Abandonment--in Alexander County, Illinois, 366 I.C.C. 911 (1983), aff'd sub nom. Simmons v. I.C.C., 760 F.2d 126 (7th Cir.1985), cert. denied, --- U.S. ----, 106 S.Ct. 791, 88 L.Ed.2d 769 (U.S.1986).B. Trackage Rights Acquisition Under 49 U.S.C. Sec. 10901
 
 
 11
 On the same day that SIRC requested the ICC to withdraw the portion of its application for abandonment dealing with trackage rights, DO, NYS & W and SIRY submitted to the ICC a petition for an exemption, pursuant to 49 U.S.C. Sec. 10505, from the requirements of 49 U.S.C. Sec. 10901 for a proposed independent assignment of SIRC's trackage rights to SIRY. Section 10901 governs rail line acquisitions by entities not previously in the rail carriage business and permits such acquisitions "only if the [ICC] finds that the present or future public convenience and necessity require or permit the construction or acquisition (or both) and operation of the railroad line." Id. Sec. 10901(a).
 
 
 12
 RLEA vehemently opposed the request on the ground that section 10901 did not apply to a trackage rights acquisition. Rather, RLEA asserted, trackage rights fell within the purview of 49 U.S.C. Sec. 11343, the provision governing consolidations, mergers and acquisitions between rail carriers. The basis for RLEA's position was clear: under section 10901, imposition of labor protective conditions on the parties to the transaction is discretionary with the ICC, id. Sec. 10901(c)(1)(A)(ii), and under section 11343, imposition of such conditions is mandatory, id. Sec. 11347.
 
 
 13
 On April 4, 1985, the ICC issued a decision granting SIRY the requested exemption on the ground that the transaction was of limited scope and that regulation of the assignment was not necessary to carry out ICC policy of furthering rail service. Staten Island Railway Corporation--Exemption From 49 U.S.C. 10901; Delaware Otsego Corporation and Staten Island Railway Corporation--Exemption From 49 U.S.C. 11301, Finance Docket No. 30629, at 2 (April 4, 1985) ("Exemption--SIRY "). The ICC further rejected application of section 11343 to the transaction, finding that that provision dealt solely with "the unification of transportation properties of two or more carriers," id. at 2, and that it did "not apply to transactions where a noncarrier [SIRY] seeks to acquire or operate a line of railroad." Id. Consequently, the ICC concluded that section 10901 applied to the transaction, since a noncarrier, SIRY, was the entity acquiring the trackage rights. In so holding, the ICC declined to impose labor protective conditions, following its policy of not imposing such conditions on newly formed acquiring carriers. Id.[7]
 
 
 14
 In the month following the decision, RLEA filed a petition with the ICC to reopen its decision, claiming a material error on the part of the ICC in its analysis. RLEA contended that SIRY, a wholly owned subsidiary of NYS & W, could not be distinguished from its parent, and, therefore, could not be classified a noncarrier for the purposes of section 10901. As a result, the transaction allegedly could not be considered to be one between a noncarrier and a carrier, but rather had to be defined as one between two carriers, requiring application of section 11343 and mandating imposition of labor protective conditions. In July of 1985, the ICC denied the petition, finding no material error in its initial decision and holding SIRY to be sufficiently independent of NYS & W to be classified as a noncarrier. The ICC noted:
 
 
 15
 The control relationship between NYS & W and SIRY does not warrant a finding that SIRY and NYS & W are one and the same and that section 11343 is applicable. Replicants have demonstrated that SIRY is an entity separate and apart from NYS & W. As noted by replicants, continued operation of the involved rail line is an uncertain venture. NYS & W has not assumed all risks of that venture, but has merely guaranteed SIRY's obligation to SIRC. The remaining risks of this venture lie with SIRY and not NYS & W. NYS & W's creation of a new subsidiary to insulate itself from all other risks associated with this venture constitutes sound business practice with which we will not interfere. Nor does the offer by NYS & W of employment with SIRY to former SIRC employees warrant a finding that NYS & W and SIRY are actually the same entity.
 
 
 16
 Staten Island Railway Corporation--Exemption From 49 U.S.C. 10901; Delaware Otsego Corporation and Staten Island Railway Corporation--Exemption From 49 U.S.C. 11301, Finance Docket No. 30629, at 2 (July 11, 1985).
 
 C. RLEA's Position on Appeal
 
 17
 In the summer of 1985, RLEA filed these petitions to review the ICC orders approving both the line and trackage rights acquisitions. The gravamen of the petitions is that the ICC erred in permitting the sales to be consummated under section 10905 and section 10901 rather than under the merger and consolidation provisions of section 11343, and, consequently, erred in not imposing labor protective conditions on SIRC and SIRY for either transaction. RLEA posits that SIRC's initial application to abandon, brought under section 10903 and encompassing all 31.16 miles of the SIRC rail system, constituted nothing more than a subterfuge to enable SIRC to sell its lines under the financial assistance provisions of section 10905. Noting that the purpose of section 10905 is to provide a mechanism for the sale of lines that otherwise would be abandoned, RLEA claims that SIRC never actually intended to abandon its lines but rather had planned (and in fact had agreed prior to the filing of its application to abandon) to sell the entire system to DO. The only reason for this alleged masquerade, according to RLEA, was to avoid consummation of the sale under section 11343 and the subsequent imposition of that provision's mandatory labor protective conditions.
 
 
 18
 Alternatively, were we to examine the line and trackage rights acquisitions independently, RLEA submits that the ICC's interpretations of section 10905 and section 10901 are flawed. First, RLEA contends that section 10905's silence concerning labor protective conditions should not foreclose their imposition in sales under that provision. Noting that section 10903(b)(2), which mandates imposition of such conditions for all partial line abandonments, is remedial in nature and therefore must be construed broadly to effectuate its purpose, see Peyton v. Rowe, 391 U.S. 54, 65, 88 S.Ct. 1549, 1555, 20 L.Ed.2d 426 (1968), and also that Congress traditionally has viewed labor protection to be of paramount importance, RLEA asserts that section 10903 must be read to supplement section 10905 on the issue of employee protection.
 
 
 19
 As for section 10901, RLEA contends that trackage rights acquisitions, regardless whether the acquiring party is a carrier or noncarrier, are not included within that provision, but rather come within the ambit of section 11343. RLEA further alleges that this not only was the intent of Congress in enacting section 11343, but also was the position of the ICC until an abrupt change in recent decisions. Compare North Western Employees Transportation Corporation--Purchase--Chicago and North Western Railway Company, 342 I.C.C. 58, 65 (1972) ("North Western") with Alabama Southern Railroad Company, Inc. and the Alabama Great Southern Railroad Company--Acquisitions, Operations and Trackage Rights--Exemption, Finance Docket No. 30505 (Aug. 29, 1984) ("Alabama Southern"). Finally, even if we view trackage rights acquisitions by noncarriers as falling within the ambit of section 10901, RLEA argues that SIRY cannot be considered to be a noncarrier. Rather than looking solely to the corporate form of SIRY, RLEA urges that the ICC should have examined the substance of the transactions to determine whether SIRY was truly independent or performing as part of the DO system.
 
 II. DISCUSSION
 A. Subterfuge
 
 20
 RLEA's argument is based upon two incidents: SIRC's request to withdraw the portion of its application to abandon covering trackage rights immediately following the ICC's rejection of that portion of the application and SIRY's simultaneous request for an exemption for a separate trackage rights acquisition under section 10901. In addition, RLEA directs our attention to two letters, submitted to the ICC in January of 1985 by the Staten Island Committee for Revitalization and Growth of Commerce, Industry and Governmental Services ("Committee") and the Staten Island Borough President in support of SIRC's application, which allegedly suggest that SIRC and DO had reached an agreement for the sale of the lines months prior to the filing of the application to abandon. These submissions by SIRC and its supporters, according to RLEA, clearly indicate that SIRC never actually intended to abandon its line, and, accordingly, that section 10905 should not have governed the sale.
 
 
 21
 RLEA, however, did not raise this subterfuge argument before the ICC in the initial review of the abandonment application or in a subsequent petition to reconsider the ICC's order. We therefore decline to review the issue here. It is beyond cavil that a petitioner's failure to assert an argument before an administrative agency bars it from asserting that argument for the first time before a reviewing court. United States v. L.A. Tucker Truck Lines, Inc., 344 U.S. 33, 37, 73 S.Ct. 67, 69, 97 L.Ed. 54 (1952); accord Unemployment Compensation Commission v. Aragon, 329 U.S. 143, 155, 67 S.Ct. 245, 251, 91 L.Ed. 136 (1946) ("A reviewing court usurps the agency's function when it sets aside the administrative determination upon a ground not theretofore presented and deprives the Commission of an opportunity to consider the matter, make its ruling, and state the reasons for its action."). Considerations of "[s]imple fairness" require us to respect the broad parameters of administrative review and not to "topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice." Tucker, 344 U.S. at 37, 73 S.Ct. at 69. Given these limitations, we have declined to review arguments not raised before an administrative agency, absent the existence of exceptional circumstances. New York v. United States, 568 F.2d 887, 897-98 (2d Cir.1977), cert. denied, 449 U.S. 887, 101 S.Ct. 243, 66 L.Ed.2d 113 (1980).
 
 
 22
 No exceptional circumstances exist here. Prior to the filing of its petition to review, RLEA had adequate information to assert this argument before the ICC, but nonetheless failed to do so. SIRC's application to abandon specifically apprised the ICC, and all other interested parties, that SIRC and DO had been negotiating the sale of the lines. RLEA also was aware of both SIRC's request to withdraw a portion of its application and SIRY's request for an exemption under section 10505, expressly objecting to the latter request. Cognizant of this information, RLEA not only failed to raise the issue, but also argued before the ICC that the abandonment provisions of section 10903 should apply since SIRC's application was for a partial line abandonment. We find no reason to usurp the initial review jurisdiction of the ICC under these circumstances.
 
 
 23
 RLEA contends that it failed to raise the issue prior to the filing of the petition for review because it was unaware of SIRC's true intent at the time. RLEA points to the letters from the Committee and the Staten Island Borough President, which RLEA did not review until after filing the petition, as proof of its late discovery of SIRC's intent. RLEA's reliance on these letters, however, sent to the ICC months prior to the filing of the petition, is misplaced. While RLEA rightfully was not served with these letters at the time of their filing, see 49 C.F.R. Sec. 1152.25(c) (1984), nothing in the record suggests that RLEA could not have examined these public comments at any time prior to the filing of its petitions.
 
 
 24
 More important, the letters do not add substantial information to the record that was not already known by RLEA at the time of the ICC's decision on SIRC's application. The Committee's letter stated that negotiations between SIRC and DO have "resulted in a plan and agreement" and further indicated that the Committee would withdraw its support of the application if the "pending agreement between the respective railroads not be successfully and amicably concluded...." The Borough President's letter also stated that in June of 1984 (five months prior to the filing of SIRC's application to abandon) SIRC "announced its intention to enter into an agreement with [DO], whereby [DO] would assume this service." At best, these letters indicate that SIRC and DO had been negotiating a sale for several months, a fact then known to RLEA. They do not, however, establish the existence of a finalized agreement between the parties or suggest that SIRC did not intend to abandon its line if negotiations over a finalized agreement fell through. Accordingly, we find no merit to RLEA's argument and no reason to excuse its failure to raise this issue before the ICC.
 
 
 25
 With this disposition of the subterfuge issue, we are left to examine the sale as two independent acquisitions: one for the line owned by SIRC under section 10905 and one for the trackage rights over SIRTOA track under section 10901.
 
 
 26
 B. Section 10905 and Labor Protective Conditions
 
 
 27
 The ICC's position regarding its authority to impose labor protective conditions in line sales under section 10905 is best understood from the historical development of that provision. Section 10905 originated in the Railroad Revitalization and Regulatory Reform Act of 1976, Pub.L. No. 94-210, 90 Stat. 129 (1976), and later was amended in 1978, Pub.L. No. 95-473, 92 Stat. 1405 (1978). As the provision read originally and after the amendment, the ICC had the authority only to postpone the issuance of a certificate "for a reasonable time," 49 U.S.C. Sec. 10905(b) (Supp. II 1978), amended by 49 U.S.C.A. Sec. 10905 (1985), in order to provide the abandoning carrier and the prospective purchaser of the line an opportunity to negotiate a sale; it did not have the authority to force a sale and the statute was silent as to the disposition of the abandonment application upon the consummation of a sale agreement. In light of this skeletal framework of section 10905, the ICC took the position that, once an agreement for a sale was reached, the parties were required to file an application to acquire the line under section 10901 or section 11343, whichever was appropriate under the circumstances. Abandonment of Railroad Lines and Discontinuance of Service, 354 I.C.C. 252 (1976). This interpretation, in turn, made parties to a section 10905 sale susceptible to the imposition of labor protective conditions.
 
 
 28
 As part of a broad federal effort to enhance the financial condition of the railroad industry and to ease the regulatory environment surrounding the operation of domestic rail systems, H.R.Rep. No. 1035, 96th Cong.2d Sess. 34-35, reprinted in 1980 U.S. Code Cong. & Ad. News 3978, 3979-80, section 10905 was amended to its present form in the Staggers Rail Act of 1980, Pub.L. No. 96-448, Title IV, Sec. 402(c), 94 Stat. 1895 (1980) ("Staggers Act"). The amendment altered section 10905 in two critical ways; it authorized the ICC to force a sale of a line upon the request of either party if an agreement between the parties could not be reached during the period for negotiations, 49 U.S.C.A. Sec. 10905(f) (1985), and it directed the ICC to "approve the transaction and dismiss the application for abandonment" when the parties entered into a sale agreement assuring continued rail service over the line, id. Sec. 10905(e). In light of these changes, the ICC altered its interpretation of section 10905 and now takes the position that it cannot impose labor protective conditions under that provision. Illinois Central Railroad--Abandonment--in Alexander County, Illinois, 366 I.C.C. 911 (1983), aff'd sub nom. Simmons v. I.C.C., 760 F.2d 126 (7th Cir.1985), cert. denied, --- U.S. ----, 106 S.Ct. 791, 88 L.Ed.2d 769 (U.S.1986).
 
 
 29
 The ICC sets forth three bases for its new interpretation: it points out that section 10905 is silent as to the imposition of protective conditions and thus does not grant the ICC explicit authority to impose them; it contends that the section's new directive to "approve the transaction" upon an agreement between the parties forecloses imposition of the requirements of any other statute; and it posits that section 10905's directive to "dismiss the application for abandonment" requires the ICC to dismiss the entire abandonment proceeding, including any conditions previously imposed upon the application under section 10903.
 
 
 30
 In reviewing this interpretation, we must accord substantial weight to the ICC's construction of a statute which it is entrusted to administer. Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 2782-83, 81 L.Ed.2d 694 (1984). If the agency's interpretation "represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute," id. 104 S.Ct. at 2783 (quoting United States v. Shimer, 367 U.S. 374, 382, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961)), we are constrained to follow that interpretation "unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned," 104 S.Ct. at 2783. Mindful of these limitations, we conclude that the ICC's interpretation of section 10905 is reasonable, and, consequently, agree with the agency's actions stemming therefrom.
 
 
 31
 The silence of section 10905 regarding the imposition of labor protective conditions, in contrast to the express authority given to the ICC for the imposition of such conditions under other provisions governing rail line acquisitions, is persuasive.[8] E.g., 49 U.S.C.A. Sec. 11347 (1985) (imposition of labor protective conditions by ICC mandatory for rail mergers and consolidations); 49 U.S.C.A. Sec. 10901 (1985) (imposition of labor protective conditions by ICC discretionary for line acquisitions by noncarriers); 49 U.S.C.A. Sec. 10903(b)(2) (1985) (imposition of labor protective conditions by ICC mandatory for abandonments). Where Congress has deemed labor protection necessary for rail transactions, it has not hesitated to provide the ICC with the express authority to impose conditions. The Staggers Act, which amended section 10905 to its present form, itself included several amendments to other provisions refining the available labor protection for those rail transactions. E.g., Pub.L. No. 96-448, Title II, Sec. 213, 94 Stat. 1912-13 (1980) (codified at 49 U.S.C.A. Sec. 10505(g) (1985)) (excluding from the reach of an exemption under section 10505 any labor protective conditions otherwise required by the governing statute); Pub.L. No. 96-448, Title II, Sec. 227(a), 94 Stat. 1931 (1980) (codified as amended at 11 U.S.C.A. Sec. 1170 (1979 & West Supp.1985)) (requiring imposition of labor protective conditions when line is abandoned pursuant to a railroad bankruptcy proceeding); Pub.L. No. 96-448, Title II, Sec. 227(b), 94 Stat. 1931 (1980) (codified as amended at 11 U.S.C.A. Sec. 1172(b) (1979 & Supp.1985)) (requiring imposition of labor protective conditions when debtor's rail lines are transferred to another party in a railroad bankruptcy proceeding); see Railway Labor Executives' Association v. I.C.C., 735 F.2d 691, 700 (2d Cir.1984). It therefore cannot be unreasonable for the ICC to interpret congressional silence in section 10905 to preclude it from imposing labor protective conditions in such sales. As the Seventh Circuit recently noted in reaching the same conclusion, "[a]gainst this background, the silence of section 10905 on the matter of conditions has a certain eloquence, especially when we consider the active participation of the railroad unions in revisions of the Interstate Commerce Act." Simmons v. I.C.C., 760 F.2d 126, 130 (7th Cir.1985) ("Simmons I "), cert. denied, --- U.S. ----, 106 S.Ct. 791, 88 L.Ed.2d 769 (U.S.1986); accord Simmons v. I.C.C., 766 F.2d 1177 (7th Cir.1985) ("Simmons II "), cert. denied, --- U.S. ----, 106 S.Ct. 791, 88 L.Ed.2d 769 (U.S.1986).
 
 
 32
 RLEA's attempt to read the post-Staggers Act version of section 10905 as also requiring separate sale approval under section 10901 or section 11343 or as incorporating the provisions of section 10903 simply ignores the express directives of the statute. Cf. Railway Labor Executives' Association v. I.C.C., 784 F.2d 959-965, 967 (9th Cir.1986) (application of section 10903(b)(2) to an outright acquisition under section 10901 not appropriate where abandonment application is superseded by the acquisition). Without restriction, the ICC now is required to approve the sale and dismiss the abandonment proceeding upon a sale agreement being reached. This court may not properly command the ICC to ignore that express language and to adopt an interpretation of that provision facially inconsistent with statutory directive. While RLEA may well be correct in suggesting that the provisions it seeks to invoke are remedial and must be construed broadly, broad construction cannot mean simple disregard of otherwise clear statutory directive.
 
 
 33
 In so holding, we note that the ICC's construction is consistent with the true purpose of section 10905--to preserve rail service over a line which otherwise would be abandoned. If labor protective conditions were required for such transactions, negotiations between parties obviously would be impeded and the prospect for a sale of the line and continuation of service prior to abandonment would be more unlikely. If lines then are abandoned rather than sold under section 10905, many union members represented by RLEA would be faced with a much more traumatic exigency--the certain loss of their employment. We therefore agree with Simmons I that "there is no great anomaly if the appearance of a white knight ... who saves a line from abandonment has the consequence of disentitling employees on the line to protective conditions and forcing them to take their chances on being kept on by the line's new owner." Simmons I, 760 F.2d at 131.
 
 
 34
 C. Section 10901 and Trackage Rights Acquisitions
 
 
 35
 The issue whether the ICC erred in failing to impose labor protective conditions upon SIRC and SIRY pursuant to the separate trackage rights transaction is resolved by determining which statute properly governed that sale. It is the position of the ICC that all such acquisitions of trackage rights over single lines by noncarriers fall within the ambit of section 10901, the provision governing line acquisitions by noncarriers. E.g., Exemption--SIRY, at 1-2; Southern Alabama, at 1-2. It further is the position of the ICC that section 11343 is inapplicable to such transactions because that provision is concerned solely with transactions which integrate two or more carriers and which thereby affect the competitive nature of the rail market. Exemption--SIRY, at 2; Southern Alabama, at 1-2. Accordingly, because here SIRY was classified as a noncarrier on the grounds that it was newly formed and had not been involved previously in rail commerce, section 10901 was applied to the sale, making the imposition of protective conditions merely discretionary with the ICC.
 
 
 36
 Mindful again of the limits to our review of an agency's construction of statutory provisions which it is entrusted to administer, Chevron, U.S.A., 104 S.Ct. at 2782-83, we conclude that the ICC's interpretations of the parameters of section 10901 and section 11343 are reasonable, and therefore sanction the inclusion of trackage rights acquisitions of this sort by noncarriers within section 10901. RLEA does not, and could not, dispute that section 10901 governs single line acquisitions by noncarriers. E.g., Railway Labor Executives' Association v. I.C.C., 784 F.2d 959, 963 n. 4 (9th Cir.1986); Black v. I.C.C., 762 F.2d 106, 111 (D.C.Cir.1985); In re Chicago, Milwaukee, St. Paul & Pacific Railroad Company, 658 F.2d 1149, 1169 (7th Cir.1981), cert. denied, 455 U.S. 1000, 102 S.Ct. 1632, 71 L.Ed.2d 867 (1982); Illinois v. United States, 604 F.2d 519, 524 (7th Cir.1979), cert. denied, 445 U.S. 951, 100 S.Ct. 1599, 63 L.Ed.2d 786 (1980). In light of this well-established interpretation, we find no reason to differentiate between a noncarrier acquiring a new rail line and a noncarrier acquiring trackage rights over a single line. Neither type of transaction implicates anticompetitive concerns and thus both should be governed by section 10901.
 
 
 37
 The trackage rights provision of section 11343 clearly is inapplicable to the acquisition here. It provides that ICC approval is necessary for an "acquisition by a rail carrier of trackage rights over ... a railroad line ... owned or operated by another rail carrier." 49 U.S.C.A. Sec. 11343(a)(6) (1985). By its terms, therefore, the provision is limited to acquisitions involving two or more carriers.[9] This stems from "the fact that Sec. 11343 is plainly concerned not with new, non-carrier entities entering the railway market through limited acquisitions ..., but with transactions integrating two or more carriers and with the effect of multi-carrier transactions on competition." Black v. I.C.C., 762 F.2d at 115. Moreover, section 11343 specifies two situations involving noncarriers: where a noncarrier acquires control "of a least 2 carriers," 49 U.S.C.A. Sec. 11343(a)(4), and where a noncarrier that controls a number of carriers acquires control of an additional carrier, id. Sec. 11343(a)(5). Since the statute includes only these two noncarrier transactions, it is logical to conclude that other noncarrier transactions, such as a trackage rights acquisition over a single line, are not encompassed within that statute. Judicial extension of the statute to include other noncarrier transactions not otherwise specified within that provision, thereby imposing upon the noncarrier the mandatory protective conditions of that statute, may simply "discourage such new entry into the rail market." Black v. I.C.C., 762 F.2d at 115.[10]
 
 
 38
 RLEA's reliance on the legislative history to demonstrate that Congress intended all trackage rights acquisitions to be governed by section 11343 is entirely misplaced. Nowhere in the legislative history is there any indication that Congress intended to include noncarriers within section 11343 for single line trackage rights acquisitions. In fact, the passages referred to by RLEA discuss trackage rights in relation to the unification of carriers and in terms of one railroad acquiring operating rights over another, e.g., S.Rep. No. 433, 76th Cong. 1st Sess. 26, 29 (1939); this language hardly covers a situation where a noncarrier acquires such rights over a single line.
 
 
 39
 We further reject RLEA's assertion that Southern Alabama and this case mark a dramatic shift in ICC policy toward the acquisition of trackage rights over single lines by noncarriers. RLEA cites three prior ICC decisions for the proposition that, prior to 1980, the ICC interpreted section 11343 as including all trackage rights acquisitions. E.g., North Western Employees Transportation Corporation--Purchase--Chicago and North Western Railway Company, 342 I.C.C. 58 (1972); Spokane, Portland & Seattle Railway--Control, 334 I.C.C. 419 (1969); Chicago, Burlington & Quincy Railroad--Control, 271 I.C.C. 63 (1948). None of these decisions supports RLEA's position. Spokane and Chicago did not address the issue of trackage rights acquisitions by noncarriers. While North Western did hold that section 10901 and section 11343 are "complementary, not mutually exclusive" in dealing with a trackage rights acquisition by a noncarrier, North Western, 342 I.C.C. at 65, the basis for the complementary jurisdiction in that case was that the noncarrier at issue, Netco, was attempting to acquire the trackage rights and lines of more than one carrier, see id., a transaction expressly within the ambit of section 11343, see 49 U.S.C.A. Sec. 11343(a)(4). North Western further indicated that under ordinary circumstances section 11343 "does not deal with the licensing of a noncarrier applicant, such as Netco, that has never performed common carrier service." North Western, 342 I.C.C. at 65.
 
 
 40
 By contrast, at least one decision of the ICC prior to 1980 specifically authorized the acquisition of trackage rights over a single rail line by a noncarrier under section 10901. Prairie Trunk Railway--Acquisition and Operation, 348 I.C.C. 832 (1977), aff'd sub nom. Illinois v. United States, 604 F.2d 519 (7th Cir.1979), cert. denied, 445 U.S. 951, 100 S.Ct. 1599, 63 L.Ed.2d 786 (1980). In Prairie Trunk, a noncarrier requested ICC approval under section 1(18) of the Interstate Commerce Act (now section 10901) for the acquisition of 73.27 miles of the B & O railroad, including 5.36 miles of trackage rights jointly owned with the Louisville & Nashville Railroad. The ICC approved the entire acquisition under section 10901 on the ground that that provision was intended to encompass the acquisition of an individual line and was essentially directed at the activities of prospective new rail carriers such as the one at issue therein. 348 I.C.C. at 850-51. In so holding, the ICC specifically rejected application of section 5(2) of the Interstate Commerce Act (now section 11343) on the ground that that provision was concerned primarily with transactions between two or more carriers. Id.
 
 
 41
 RLEA attempts to distinguish Prairie Trunk on the grounds that the trackage rights acquisition therein was de minimis in light of the other acquisitions at issue, that the Seventh Circuit in affirming the ICC's decision had not considered the legislative history of section 11343, and that labor protective conditions nonetheless were imposed in that case. These arguments are without merit. All of these features were discussed by the Seventh Circuit as reasons for its affirmance of the ICC's order. 604 F.2d at 526-27. None, however, was cited by the ICC as a reason for its approval of the acquisition. They therefore do not detract from the primary point which Prairie Trunk makes in relation to this review--that the ICC had approved trackage rights acquisitions by noncarriers under section 10901 prior to 1980.
 
 
 42
 More important, these distinguishing features in themselves are not convincing. The Seventh Circuit in Prairie Trunk considered the trackage rights at issue to be de minimis since they covered only 5.36 miles of track. Id. at 526. Here, we fail to comprehend why a mere 14.48 miles of trackage rights should be considered any more significant. Second, rather than not reviewing adequately the legislative history of section 11343, the Seventh Circuit followed the same analysis which we now follow, holding section 11343 inapplicable because it is concerned solely with multicarrier transactions. Id. Finally, regardless whether labor protective conditions otherwise were imposed in Prairie Trunk, section 10901 leaves that determination to the sole discretion of the ICC.
 
 
 43
 Given that section 10901 reasonably may be interpreted to include trackage rights acquisitions over single lines by noncarriers, the only remaining issue to resolve is whether the ICC properly classified SIRY, a newly formed, wholly owned subsidiary of NYS & W, as a noncarrier for the purposes of section 10901. We have little difficulty in concluding that SIRY was classified properly. Our review of the agency's factual finding is governed by the Administrative Procedure Act, 5 U.S.C.A. Sec. 706 (1977), which requires approval of the agency's decision unless such decision is found to be arbitrary, capricious, an abuse of discretion or not in accordance with law, id. Sec. 706(2)(A), or is not supported by substantial evidence, id. Sec. 706(2)(E). Here, the ICC, in response to RLEA's petition to reconsider its initial approval of the exemption, found that SIRY was formed not to elude the otherwise applicable provisions of section 11343, but rather to distance the parent from the inherent risks involved in the continued operation of a rail line. SIRY has assumed all of the risks of the venture on its own and is not to be financially guaranteed by its parent, absent its direct obligations to SIRC pursuant to the sale. Given these indicia of independence, we find nothing improper about classifying SIRY, a completely new enterprise, as a noncarrier even though its parent, NYS & W, is a carrier.[11]
 
 
 44
 RLEA's contention that the ICC erred in looking to the corporate form of SIRY rather than to whether SIRY was to be acting as part of the DO rail system is unpersuasive. RLEA's sole support for this proposition is the ICC's previous decision in United Transportation Union v. Bessemer and Lake Erie Railroad Company, 342 I.C.C. 849 (1974), which dealt with the issue of whether an already existing affiliate of a carrier also was a carrier for the purposes of the Interstate Commerce Act. In concluding that the affiliate was performing the work of a carrier and therefore should be classified as such, the ICC examined the function of the company and the duties which it performed for its carrier affiliate. The ICC's holding in that case, however, was not based upon the company's status as an affiliate of the rail carrier, but rather was based upon that affiliate's function and the work which it was then performing. Consequently, Bessemer's application to a situation where the corporate affiliate is newly formed and therefore has no history of rail carriage duties is questionable at best. Certainly, it does not stand for the proposition that a newly formed corporate affiliate with substantial indicia of independence cannot be separated from its parent for the purposes of a single trackage rights acquisition.
 
 III. CONCLUSION
 
 45
 For all the foregoing reasons, we deny and dismiss the petitions.
 
 
 
 [1]
 SIRC and SIRY are intervenors for the purposes of this appeal. SIRC is a rail carrier and a wholly owned subsidiary of the Maryland and West Virginia Company which in turn is owned by the Baltimore and Ohio Railroad Company ("B & O"). B & O is a part of the Chessie System which is a unit of CSX Corporation, a newly formed holding corporation. See CSX Corporation--Control, 363 I.C.C. 521 (1980), aff'd sub nom. Brotherhood of Maintenance of Way Employees v. I.C.C., 698 F.2d 315 (7th Cir.1983). SIRY's parent, NYS & W, is owned by the Delaware Otsego System
 
 
 [2]
 SIRC contends that operation of the line has resulted in nearly $28 million in accumulated operating deficits and that necessary renovations and maintenance for the line would cost well over an additional million dollars. RLEA takes exception to SIRC's figures and alleges that the line has taken a dramatic turn for the better in recent years. RLEA points out that in the first 11 months of 1984, SIRC showed an operating profit of $556,033
 
 
 [3]
 Section 10903(b)(2) provides that each certificate of public necessity issued by the ICC pursuant to a rail line abandonment "shall also contain provisions to protect the interests of employees." 49 U.S.C.A. Sec. 10903(b)(2) (1985). The ICC, however, with our approval, traditionally has followed a policy of not imposing labor protective conditions upon a carrier that is abandoning its entire line. Railway Labor Executives' Association v. I.C.C., 735 F.2d 691, 696-701 (2d Cir.1984)
 
 
 [4]
 The basis for the ICC's decision to impose labor protective conditions upon SIRC was its conclusion that SIRC's application to abandon did not constitute an entire line abandonment. While SIRC's request was for an abandonment of all lines within its control, the ICC viewed SIRC's lines as merely a part of the much larger Chessie System and thus it viewed SIRC's application as merely a request to abandon a portion of that larger system. It noted:
 Applicant is owned by the Maryland and West Virginia Company, which, in turn, is owned by the Baltimore and Ohio Railroad Company (B & O). B & O is one of the Chessie System Railroads, a unit of the CSX Corporation. Applicant is part of the Chessie System. Hence, this proceeding involves the partial abandonment of service by the B & O/Chessie System, and is not an entire line abandonment. It is apparent that applicant's affiliated corporations benefit from this abandonment since deficits would be eliminated. Applicant's affiliates also have sufficient financial resources to cover the cost of labor protection attendant to an abandonment.
 The Staten Island Railroad Corporation--Abandonment and Discontinuance of Service--In Richmond County, NY and Union County, NJ, AB-231, at 1 (Feb. 1, 1985).
 
 
 [5]
 The ICC routinely imposes Oregon Short Line conditions upon the party that wishes to abandon its lines under Sec. 10903. These conditions are imposed solely upon the abandoning party and, among other things, require the abandoning carrier to pay wages to those employees who lose their jobs because of the abandonment for up to six years from the date of the abandonment
 
 
 [6]
 DO's financial guarantee included only SIRY's financial obligations as to SIRC. It did not include any other financial obligations which SIRY may incur in the operation of the newly acquired rail line
 
 
 [7]
 A Sec. 10505 exemption does not relieve the applicant of any obligations it has to "protect the interests of its employees," 49 U.S.C.A. Sec. 10505(g) (1985), and does not exempt the applicant from any labor protection measures imposed under the governing statute. The decision of the ICC not to impose such conditions here, therefore, was not a result of the exemption, but rather was an exercise of discretion by the ICC under Sec. 10901
 
 
 [8]
 Section 10905(f)(1)(C) does provide that when the parties fail to come to terms and request the ICC to intervene, the ICC must "determine the price and other terms of sale." This language, however, has not been interpreted to grant the ICC authority to impose labor protective conditions. Simmons v. I.C.C., 760 F.2d 126, 129 (7th Cir.1985), cert. denied, --- U.S. ----, 106 S.Ct. 791, 88 L.Ed.2d 769 (U.S.1986)
 
 
 [9]
 While Sec. 10901 also employs the term "rail carrier" in defining its coverage, it generally is accepted that that provision encompasses noncarrier transactions. E.g., Black v. I.C.C., 762 F.2d 106, 111 (D.C.Cir.1985)
 
 
 [10]
 Even more compelling in this instance is the fact that the carrier which owns the 14.48 miles of track over which SIRY will operate is SIRTOA, a public entity. Consequently, the risk to the competitive nature of the rail system would not appear to be as great as if a private carrier owned the line
 
 
 [11]
 While the ICC in its earlier decision approving the abandonment application did conclude that SIRC was part of the Chessie System, and therefore the abandonment could not be considered a full line abandonment, this is not inconsistent with the ICC's decision here to treat SIRY as a noncarrier for the purposes of Sec. 10901. In the former case, the ICC was attempting to determine not whether SIRC had ever engaged in carriage business, but rather whether SIRC was a part of a larger rail system; a question easily answered given that SIRC was a subsidiary of a larger carrier. Any other decision by the ICC would have been inconsistent with its policy of waiving the imposition of labor protective conditions only in the case of a full line abandonment. In the latter case, however, the ICC had to determine whether SIRY was a carrier, a question easily answered since SIRY was a newly formed subsidiary. Holding SIRY to be a carrier and thereby disregarding its financial independence from its parent simply because of its subsidiary status would have been inconsistent with the agency's policy of encouraging new entries into the rail carriage market