**Thomas DECKER, As Local Chairman for the U.T.U.; U.T.U., Local 377; and Robert W. Earley, General Chairman, U.T.U. General Committee of Adjustment C & T, B & O System, Plaintiffs,**

v.

**CSX TRANSPORTATION, INC., Defendant.**

**No. Civ–87–1147C.**

United States District Court,
W.D. New York.

Nov. 3, 1987.

Collins, Collins & DiNardo, P.C. (John F. Collins, of counsel), Buffalo, N.Y., for plaintiffs.

Akin, Gump, Strauss, Hauer & Feld (Ronald M. Johnson, of counsel), Washington, D.C., and Moot & Sprague (Courtland R. LaVallee, of counsel), Buffalo, N.Y., for defendant.

CURTIN, Chief Judge.

Plaintiffs commenced this action in state court alleging violations of the status quo provisions of the Railway Labor Act [RLA], 45 U.S.C. § 156. After defendant removed this case to federal court (Item 1), various motions were made. First, defendants moved for dismissal of CSX Corporation and John Snow as defendants in this action and for the substitution of CSX Transport, Inc. [CSXT], as the sole defendant (Item 2). On October 9, 1987, this motion was granted by this court (Item 6). Defendant now moves for dismissal of the complaint on jurisdictional grounds (Items 3, 7, and 9), which plaintiffs oppose (Items 5 and 10). Finally, defendant opposes plaintiffs' application for injunctive relief (Items 4 and 8). Because I now grant defendant CSXT's motion to dismiss, I need not rule on plaintiffs' motion for a preliminary injunction.

*Motion to Dismiss*

CSXT is a railroad carrier owned by CSX Corporation and subject to the Interstate Commerce Act [ICA] and the Railway Labor Act [RLA]. The United Transportation Union [UTU] for many years was recognized as a representative of trainmen for collective bargaining purposes under the RLA. Plaintiffs are members of one local sub-unit of the UTU International, known as Local 377 of the UTU. The UTU and the former Baltimore & Ohio Railroad [B & O] maintained a collective bargaining relationship and entered into numerous agreements over the years which affected the rights of plaintiffs. CSXT is now administering all of the collective bargaining agreements between B & O and the unions, including all agreements entered into between B & O and UTU. B & O was merged into the Chesapeake & Ohio Railway Company [C & O] on April 30, 1987, and ceased to exist. C & O thereafter ceased to exist when it was merged into CSXT on August 31, 1987.

CSXT now asserts that, because of diminished traffic on its Buffalo-to-Eidenau line, it entered into a letter of intent to sell this line to the Buffalo and Pittsburgh Railroad, Inc. [B & P] on September 16, 1987. It also asserts that this purchase, if ultimately consummated, is subject to the jurisdiction of the Interstate Commerce Commission [ICC], with which, under the ICA, unions would have the opportunity to participate in regulatory proceedings to request the imposition of labor protective conditions. *See* 49 U.S.C. § 10901 (which requires a non-carrier which purchases a railroad line to obtain a certificate of public convenience and necessity from the ICC before acquiring and operating that line). However, CSXT indicates that on September 22, 1987, B & P requested the ICC, pursuant to 49 U.S.C. § 10505, to exempt it from the requirements of § 10901, including the labor protective conditions sought by plaintiffs (Item 7, Exh. A, Attachment

1). CSXT states, in fact, that the ICC's 1985 decision in *Ex Parte No. 392* (attached as Exhibit C to Item 7), which was affirmed in *Illinois Commerce Commission v. ICC*, 817 F.2d 145 (D.C.Cir.1987) (attached to Item 7, Exh. C), now exempts non-carriers from the requirements of § 10901 altogether, absent an exceptional showing of circumstances justifying the imposition of labor protection. Defendant says that under the new procedures, a new operator is automatically authorized to acquire a line seven days after it files a Notice of Exemption. 49 C.F.R. § 1150.32(b). Finally, CSXT notes that plaintiffs' petition to the ICC to stay or reject the operation of B & P's Notice of Exemption was denied on October 13, 1987 (Item 9).[1] *See also* Item 11.

CSXT argues that the most recent round of national bargaining resulted in a new UTU National Agreement [National Agreement] dated October 31, 1985, between the UTU and the railroads, as represented by the National Carrier Conference Committee [NCCC]. Defendant says that although Item 15 of the UTU's 1984 proposal sought job security and labor protection (*see* Item 3, p. 6), this proposal was not included in the National Agreement. Further, defendant states that section 2(c) of Article XVII of the National Agreement provides that no new § 6 notices for bargaining can be served upon the carriers until April 1, 1988, regarding matters proposed during the last round of national bargaining.

Moreover, CSXT contends that the National Agreement creates a Joint Interpretation Committee to resolve questions concerning the interpretation or application of the National Agreement. CSXT states that, pertinent to this case, on March 20, 1987, the Joint Interpretation Committee issued the results of an arbitration decision on the issue of whether Article XVII of the National Agreement barred notices regarding the effects of sales of rail lines on employees. The committee concluded:

> Since Item 15 of the Organization's Section 6 Notice of January 4, 1984 ... encompassed subject matter similar to that referenced in the Question at Issue ... we think it clearly evident that any Section 6 Notice embodying such like general subject matter must be held to fall within the purview of the moratorium provisions of Section 2(c) of the Article XVII, supra, and can neither be served nor progressed prior to April 1, 1988.

Defendant CSXT says that on April 15, 1987, plaintiffs served upon it a purported notice pursuant to RLA § 6 seeking to bargain about a proposal to protect the employees' right to work in the event of future sales or leases of rail line.

In response, defendant makes several arguments in support of its motion to dismiss. It asserts, first, that CSXT has no duty to bargain over the UTU notice because this notice is barred by the moratorium in the National Agreement. *Seaboard World Airlines, Inc. v. Transport Workers Union*, 443 F.2d 437, 439 (2d Cir.1971). Second, it says that plaintiff Local 377 lacks standing in this case because the UTU International is the exclusive bargaining representative for the employees working on the line. *District 100, IAM v. Compagnie Nationale Air France*, 414 F.Supp. 538, 541 (E.D.N.Y.1976). Third, CSXT says that the sale of the line neither violates the status quo nor creates a duty to bargain because the carrier has the unilateral right to sell lines without first bargaining, *First National Maintenance Corp. v. NLRB*, 452 U.S. 666, 101 S.Ct. 2573, 69 L.Ed.2d 318 (1981). Fourth, defendant states that the ICC preempts the application of RLA § 6 and that a union must petition the ICC for labor protections beyond those already negotiated. *See Ex Parte No. 392, supra; Railway Labor Executives' Association v. Staten Island Railroad Corp.*, 792 F.2d 7 (2d Cir.1986), *cert. denied,* — U.S. —, 107 S.Ct. 927, 93 L.Ed.2d 978 (1987). According to CSXT, UTU's requested injunction constitutes a collateral attack on the ICC class exemption rules, and warrants

---

**1.** On October 14, 1987, the UTU petitioned the ICC for permission to engage in discovery with respect to the Notice of Exemption filed by B & P on September 22, 1987. This request was granted (Item 12).

dismissal by this court for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted.

Plaintiffs have a different view of this matter. They note that although defendant claims that the RLA § 6 does not properly apply in this case, plaintiffs have requested the services of National Mediation Board [NMB] to help resolve this dispute as provided for in the RLA. They note that the NMB has docketed the question they raised as a major dispute under the RLA, thereby triggering the status quo provisions of RLA § 6. Plaintiffs say:

> that plaintiffs have been led to believe that rather than continuing further negotiations with the plaintiffs as provided for in the Railway Labor Act, the [defendant is] going to make unilateral changes in the plaintiff's working conditions and subvert the intent of the Act by the possible sale of the lines on which plaintiffs presently work and that the [defendant seeks] to unilaterally alter the status quo by selling a portion of the former B & O system.

Motion for Temporary Restraining Order, ¶ 5, attached to Item 4. Plaintiffs now seek to enjoin the defendant from violating the status quo provisions of RLA § 6 and to force it to comply with the mandate of the law thereunder by exhausting its procedures before resorting to self-help. *Brotherhood of Railroad Trainmen v. Jacksonville Terminal Company,* 394 U.S. 369, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969); *Fall River Dyeing & Finishing Corp. v. NLRB,* —— U.S. ——, 107 S.Ct. 2225, 96 L.Ed.2d 22 (1987). Plaintiffs say that the *Staten Island* case cited by defendant is inapposite here.

Second, plaintiffs argue that CSXT's proposed sale is an act of subterfuge designed to circumvent the status quo provisions of the RLA, which are not overridden by the ICA, as defendant contends. Plaintiffs assert:

> The provisions of both the RLA and ICA can be accommodated in the instant case. It was the intent of Congress in passing the RLA to protect the rights of railway workers and to preserve the status quo

until such time as the procedures of the Act are exhausted. [42 U.S.C., Section 151(a)]. These rights can be protected by allowing the National Mediation Board or this court to determine how the Collective Bargaining process under the RLA can be enforced. Once that legal dispute is resolved, the ICC can then proceed to rule whether or not the proposed sale is legitimate.

Item 5, p. 8.

Third, plaintiffs say that a) their RLA § 6 notice is not barred by the moratorium in the National Agreement and b) that Local 377 has standing because the General Committee on Adjustment, not the UTU International, is the proper bargaining representative of plaintiffs here. Plaintiffs say that plaintiff Thomas Decker is the local chairman of the UTU Local 377, which is a member of the UTU General Committee of Adjustment, of which Robert Earley is General Chairman. While plaintiffs concede that the UTU International represents UTU locals in bargaining on a national level over wages and fringe benefits, they say that the UTU local and/or the UTU General Committee on Adjustment negotiate for each particular railroad system they represent with respect to all rules regarding local working conditions. Accordingly, plaintiffs say that because they did not engage in any of the bargaining surrounding the alleged moratorium on § 6 notices, this moratorium does not apply to them. *See,* Item 5, p. 2; *see also* Item 10. In its reply (Item 7), CSXT disputes all of plaintiffs' arguments.

After careful review of all of the case law cited by the parties, I now find that the reasoning employed in the recent Second Circuit case of *Railway Labor Executives' Association v. Staten Island Railroad Corp., supra,* is applicable here. In the *Staten Island* case, four member unions of the Railway Labor Executives' Association [RLEA] filed a RLA § 6 notice on the Staten Island Railroad Corporation [SIRC] after the unions learned that SIRC had filed an application to abandon its rail system pursuant to 49 U.S.C. § 10903, claiming loss of profits and poor conditions of

the lines as the basis for its decision. *Cf.,* *RLEA v. ICC,* 791 F.2d 994 (2d Cir.1986). The unions' notices sought to 1) amend their collective bargaining agreements to require SIRC to give them six months' advance notice of any abandonment; and 2) oppose SIRC's request before the ICC without the imposition of labor protective conditions pursuant to 49 U.S.C. § 10903(b)(2). Thereafter, the ICC granted SIRC's abandonment application with the provision that labor protective conditions continue to be imposed. 792 F.2d at 9–10.

Almost immediately thereafter, the Staten Island Railway Corporation [SIRY] made an offer to purchase SIRC's rail system under 49 U.S.C. § 10905, entitled "Offers of financial assistance to avoid abandonment and discontinuance." Pursuant to the scheme of § 10905, the ICC then issued a decision finding SIRY to be financially responsible under § 10905(d) and postponed the issuance of SIRC's abandonment certificate to give the parties an opportunity to negotiate a sale. Subsequently, SIRC and SIRY informed the ICC that they had reached an agreement and requested final approval of the sale and that no labor protective conditions be imposed, which the unions opposed. Thereafter, the ICC approved the sale and "tacitly declined" to impose labor protective conditions based on its view that § 10905 foreclosed the ICC from imposing them on a sale. 792 F.2d at 10.[2]

Significantly, the ICC decision made no mention of the unions' RLA § 6 notices and said that SIRC "complete the sale so long as the buyer consummates." Immediately thereafter, SIRC and SIRY consummated the sale and the unions commenced litigation, alleging that the sale of the rail system without negotiated labor protective conditions violated the status quo requirements of the RLA.

On appeal, the United States Court of Appeals for the Second Circuit noted that the district court committed error by dismissing the unions' claims pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure of lack of subject matter jurisdiction. It reasoned that the RLA specifies that a rail carrier has a duty to abide by negotiated collective bargaining agreements and that a district court generally has jurisdiction to enjoin the carrier from violations. Notwithstanding the above, the Second Circuit said that because the court could not provide any remedy without modifying or rescinding the ICC's order concerning the sale, it found that the unions' case had to be dismissed for failure to state a claim upon which relief could be granted. Rule 12(b)(6) of the Federal Rules of Civil Procedure.

I believe, contrary to plaintiffs' view at oral argument, that the outcome of the *Staten Island* decision was not determined solely by the fact that the case was commenced after the sale was consummated. Instead, I find that the Second Circuit makes clear that the ICC's order authorizing the sale of the SIRC rail line brought the matter of the sale solely within the province of the ICC. Any order by the district court which sought to prevent the sale, therefore, would have conflicted and improperly interfered with the ICC's mandate. 792 F.2d at 12.

I believe that the instant case presents a closely analogous set of facts. Here, as stated above, on September 16, 1987, CSXT entered into a letter of intent to sell the Buffalo-to-Eidenau line to the B & P, and about a week later, the B & P filed a Notice of Exemption pursuant to 49 U.S.C. § 10505. This Notice of Exemption is now in effect. 49 C.F.R. § 1150.32(b). *Cf., RLEA v. ICC, supra* 791 F.2d at 998. Because this court cannot fashion any of the remedies requested by plaintiffs without interfering with the order of the ICC which exempts the B & P from the requirements of § 10901, I find that plaintiffs' complaint must be dismissed for failure to state a claim upon which relief can be granted. Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Cf., RLEA v. Pittsburgh and*

---

2. SIRY also requested and was granted an exemption from the requirements of § 10901 pursuant to 49 U.S.C. § 10505. *See RLEA v. ICC, supra* 791 F.2d at 998.

*Lake Erie Railroad Co.*, 831 F.2d 1231 (W.D.Pa.1987).

So ordered.